Filed 6/29/16 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>IAN EULIAN,<br><br>    Defendant and Appellant. | B265578<br><br>(Los Angeles County<br>Super. Ct. No. BA416446 )<br><br><br>**ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on June 7, 2016, be modified in the following particulars:

On page 3, the first sentence of the first full paragraph reads: "The parties agree that Fontaine was in her Jeep in the alley behind the four-plex, for the purpose of feeding the feral cats, one week before the incident resulting in the charges against defendant." The sentence should be replaced with: "The parties agree that Stafford was in her Jeep in the alley behind the four-plex, for the purpose of feeding the feral cats, one week before the incident resulting in the charges against defendant."

On page 7, the third sentence of the second full paragraph reads: "Stafford awoke her roommate at 3:00 a.m." The sentence should be replaced with: "Stafford awakened her roommate at 3:00 a.m."

On page 7, the fourth sentence of the second full paragraph reads: "Stafford was dazed and unsure if she had been beaten, knocked out, or hit her head on something." The sentence should be replaced with: "Stafford was dazed and unsure whether she had been beaten, knocked out, or hit her head on something."

On page 21, the first full sentence reads:  "We conclude both that the instruction did not improperly affect the verdict, nor is it reasonably probable defendant would have obtained a more favorable result had CALCRM No. 3472 not be given."  This sentence should be replaced with:  "We conclude both that the instruction did not improperly affect the verdict, nor is it reasonably probable defendant would have obtained a more favorable result had CALCRIM No. 3472 not been given."

There is no change in judgment.

_____

   TURNER, P. J.                KRIEGLER, J.                BAKER, J.

Filed 6/7/16 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B265578 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA416446) |
| v. | |
| IAN EULIAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge. Affirmed.

John Steinberg for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, William H. Shin, Deputy Attorney General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the Introduction, Facts, the portion of the opinion entitled "Limitation on Self-Defense under CALCRIM No. 3472," and Disposition are certified for publication.

## INTRODUCTION

Following a hung jury and mistrial, a second jury convicted defendant and appellant Ian Eulian in count 1 of battery with serious bodily injury (Pen. Code, § 243, subd. (d)),[1] and in count 2 of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), with a finding that defendant personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). Defendant was placed on probation for a period of three years on various terms and conditions, including 180 days in county jail.

Defendant contends the judgment should be reversed for the following reasons: (1) the trial court committed prejudicial error by allowing a detective to express opinions that defendant and defendant's mother were lying about the charged incident based on the detective's observation of a video recording of the event; (2) it was prejudicial error to instruct the jury pursuant to CALCRIM No. 3472 ("Right to Self-Defense: May Not Be Contrived") because the instruction misstates the law of self-defense as explained in *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*); (3) the cumulative effect of the court's ruling on the admissibility of evidence requires reversal; and (4) the prosecutor committed misconduct by intentionally introducing inadmissible opinion testimony after failing to obtain a conviction in the first trial.

We affirm. In the published portion of this opinion, we hold that CALCRIM No. 3472 is a correct statement of law, the instruction was properly given under the facts in this case, and the reasoning of *Ramirez* has no application where the party claiming a right to self-defense did not use deadly force. In the unpublished portion of the opinion we reject defendant's remaining claims of error and prejudice.

## FACTS

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

The charges in this case stem from an altercation between three residents of the West Adams area of Los Angeles: defendant (a 39 year-old off-duty firefighter for the City of Los Angeles); defendant's 70 year-old mother Lionetta Fontaine; and 48 year-old Rebecca Stafford. Stafford routinely fed feral cats in the alley behind where defendant and his mother resided in the mother's four-plex building. According to defendant and his mother, the cats created a host of problems, including defecating in the flower beds, dying under their residence, attracting flies, and attacking Fontaine's blind dog.

The parties agree that Fontaine was in her Jeep in the alley behind the four-plex, for the purpose of feeding the feral cats, one week before the incident resulting in the charges against defendant. Ronald Richard is another resident of the four-plex owned by Fontaine. A community center is located next to the property. Richard saw Stafford's Jeep and had interaction with her regarding the feeding of cats at that location. Defendant arrived, at which point Richard stood inside the doorway of the house.[2]

Defendant told Stafford the cats were defecating in his yard and one had attacked his mother's older dog. According to Stafford, she said she would feed the cats down the alley. Defendant had a different recollection of the interaction, testifying that Stafford yelled and directed profanity toward Richard. Defendant tried to explain the problems caused by the cats, but Stafford yelled at him. Defendant told her to calm down. Stafford's temporary solution was to feed the cats at a location up the alley, but defendant said it would eventually have to stop because that was not a solution to the problems.[3]

Shortly after midnight on September 14, 2013, Stafford again parked her Jeep in the alley behind the four-plex. The community center next to the property had

---

[2] Limitations placed on the scope of Richard's testimony are the subject of one of defendant's appellate contentions, as discussed more fully below in the unpublished portion of this opinion.

[3] Fontaine testified that she had spoken to Stafford about the problem created by the cats nine to ten times, as far back as 2011. Stafford had been very defensive and not very sympathetic.

surveillance cameras in the alley which produced a particularly clear video record of what transpired. There is no audio on the recording. The trial court permitted extensive questioning regarding exactly what was said, what witnesses were thinking, and what the video showed. For purposes of a statement of facts on appeal, it is sufficient to summarize the content of the video, which we have reviewed on multiple occasions, and note the material differences in the testimony of the witnesses at trial.

Stafford testified she was in the alley looking for an injured cat when she heard defendant loudly yelling that he thought he had told her not to feed the cats there again. Stafford told defendant that she was looking for an injured cat to take to the veterinarian. Defendant testified that the argument escalated, with Stafford insisting she could do whatever she wanted and directing profanity at him; defendant responded in kind.

One video recording from the community center cameras depicts Stafford parking her Jeep in the alley. She opened her car door, placed one foot outside, and directed comments at someone who is not yet depicted in the video. Stafford became more animated as she appears to be yelling while gesturing.[4] About one minute into the video, defendant is seen walking quickly toward Stafford's car, pointing at her while appearing to yell. Defendant leaned into Stafford's car, repeatedly poking his finger close to Stafford's face. Stafford and defendant engaged in a heated argument, with each gesturing at different times.[5] As defendant continued to scream at Stafford, she reached to her right and made a throwing motion four times, throwing cat kibble toward defendant. Defendant tried to grab Stafford's arm, but appeared to lose his grip. At about the same moment, Stafford's leg is raised as if to kick or push defendant, and defendant moved backward by one step.

---

[4] Stafford testified she only became angry when defendant said he was just going to kill the cats. Stafford responded with profane name calling as the incident escalated.

[5] Stafford, defendant, and Fontaine all testified to the prolific use of profanity by Stafford and defendant. The precise language used does not affect the merits of the appeal.

The video then depicts Fontaine walking to the Jeep, where she pulled defendant away by the arm. Fontaine tried to close the door to the Jeep, but Stafford held it open. Fontaine spoke briefly to Stafford, who continued to argue and gesture toward defendant. Defendant moved to the outside of the open car door, yelling and pointing at Stafford. Stafford slapped defendant through the open car window. Fontaine moved forward and traded slaps with Stafford. Defendant moved to a position between the open car door and Stafford, with his mother on his left. Defendant threw two powerful punches at Stafford as she sat in the Jeep, leaping off his feet as he delivered the first blow. Defendant had his left arm on his mother's right shoulder at the time defendant punched at Stafford in the car. At the same moment as the punches, the video shows the movement of Stafford's foot toward Fontaine, [6] who was propelled backward either by a kick from Stafford, a push from defendant's hand on her shoulder, or a combination of the two actions.[7] Defendant forcefully grabbed Stafford and yanked her from the car, threw her to the ground, and delivered two more punches toward Stafford's head. A woman is seen walking into the alley just as defendant is striking Stafford outside of the Jeep. Stafford remained motionless on the ground for approximately two minutes before stirring.

The video depicts Stafford being helped to her feet by defendant and his mother. Stafford testified that she woke up on the on the ground, bleeding from the back of her head and crying. She was assisted into her vehicle by defendant. Stafford asked what happened. Fontaine said Stafford had tripped, fell, and hit her head on the pavement. Fontaine testified that she gave Stafford that explanation, but she had not actually seen what happened. Stafford asked defendant if he was sure he did not hit her, which defendant denied, explaining that Stafford was "acting like a crazy woman" and running around her car, hitting and kicking his mother when she tripped, fell, and hit her head on her car.

---

[6] At the preliminary hearing, Stafford testified that that after being repeatedly hit by Fontaine she kicked her away. At trial, Stafford denied ever kicking defendant or Fontaine.

[7] Defendant testified that his push did not cause his mother to fall backward.

Fontaine testified that Stafford seemed to have been trying to antagonize defendant. She confirmed trading slaps with Stafford after Stafford slapped defendant in the head through the open car window. Contrary to Stafford's testimony, Fontaine maintained she was kicked very hard in the sternum by Stafford, causing her to fall backward to the ground. Defendant testified that he told Stafford to just leave, and there was nothing to prevent her from doing so, but she remained. Defendant did not simply walk away because the problem with the cats would continue. He had walked 40 feet to get to the Jeep for the purpose of impressing on Stafford the need to leave, and not for the purpose of making physical contact.

Defendant explained in his testimony why he pulled Stafford from the car and punched her. He testified that he kept his composure and was under control during the incident. After Stafford had slapped and kicked defendant and Fontaine, and taking into account the amount of crime in the area, defendant assumed Fontaine had a weapon of some sort,[8] so he punched her to protect himself and his mother. He did not hit Stafford after she was subdued. Defendant testified that the punch he threw at Stafford inside the car did not land, and he only connected with one punch.

An anonymous caller to 9-1-1 reported that she had heard screaming and walked in the alley and did not get too close. The caller stated that "somebody has jumped on the, the lady and knocked her out. She feeds the cats, next to the school right here now." The lady's head was bleeding, she was knocked out, and was out of her truck. The caller asked the 9-1-1 operator to "hurry up, cause she's knocked out her truck is . . . ." When asked if somebody assaulted the lady, the caller replied, "Yes, they have to. Her head is bleeding, she's knocked out. She's out of her truck. . . ." The caller was asked if the lady was breathing. She replied that she could not get close and then described a male who lives next door to the school and a female, both of whom met the description of defendant and his mother. Later in the conversation the caller stated, "But, the keys are in there. I

---

[8] Defendant testified he did not see a weapon before punching Stafford. At another point defendant testified that he punched Stafford because his mother had been kicked.

6

seen that. I walked by you know, but didn't get too close." After further discussion, the caller told the operator, "I heard some screaming and hollering as I was coming towards . . . [coming] east. And I went to see."

Stafford was unable to drive home. She did not recall defendant asking her questions regarding how she felt or examining her, but defendant testified he asked her standard questions to determine her condition based on his firefighter training. After being assisted into the Jeep, Fontaine drove Stafford home, following directions give by Stafford. Defendant followed in a separate vehicle. Once parked at Stafford's home, she again asked defendant again if he was sure he did not hit her. He again said that she tripped, fell, and hit her head.

A casual acquaintance of Stafford saw her sitting in her vehicle at her home, crying with her hands on her face. The acquaintance saw defendant exit from another vehicle; she described defendant as having a nervous look. Stafford awoke her roommate at 3:00 a.m. Stafford was dazed and unsure if she had been beaten, knocked out, or hit her head on something. The roommate saw that Stafford had marks on her face and a cut on her head. She told him she thought she had been hit but was not sure. Stafford said that people told she hit her head on the car door, but it did not seem right to her, and she was pretty sure she was knocked out.

Stafford went to the hospital on the evening of September 14, where she was treated and released. She had a black eye, injuries to her left jaw, swelling to the lips and cuts inside her cheek. A physician's assistant testified that if Stafford struck her head and that caused her to pass out, that would be classified as a concussion.

On September 15, 2013, Stafford decided to make a report to the police at the urging of her friends. Stafford told the desk officer that a female and male had expressed their disapproval of her feeding cats at their location, the male approached her vehicle and opened her car door, she really did not know what happened, and at some point lost consciousness. Both suspects told her she fell and hit her face on the driver's door. She came to the police station because her injuries made her think something else had taken place.

7

Defendant presented four character witnesses, including the mother of defendant's children, a Los Angeles City firefighter paramedic, and two captains with the Los Angeles Fire Department. Each witness expressed the opinion based on years of knowledge that defendant is honest and a non-violent person. Their opinions of defendant's character were not changed by what they saw on the video of the incident.

Called by the defense, Detective Alfredo Reyes testified that he gave both Stafford and Fontaine a fair opportunity to explain what happened. He took notes during his recorded interview of Stafford, which was conducted in a police vehicle outside of her home, to avoid the noise from the animals in the home. Stafford told Detective Reyes that defendant and Fontaine told her she had fallen and hit her head.

Detective Reyes telephoned defendant on September 18, 2014, after he had interviewed Stafford and watched the video. He was unable to record the call because he did not have the adapter for the recording device and it was not his intention to conduct an interview. The purpose of the call was to let defendant know he was conducting an investigation and to confirm defendant's phone number. He asked no questions about the incident. Defendant voluntarily stated there was a confrontation by the art center and Stafford slipped and fell to the ground. The detective knew the video does not show her falling on loose gravel.[9] He took no notes, but immediately input the information from defendant into a follow-up investigation report. Defendant came to the station but declined to be interviewed on the advice of counsel.

Defendant presented a different view of the September 18 call from Detective Reyes. Defendant testified Reyes asked him if there was anything he would like to say. Defendant explained there was an argument, Stafford threw cat food at him, and slapped and kicked defendant and his mother. Stafford ended up on the ground in reaction to her conduct. Defendant did not tell the detective he had punched Stafford because he assumed Detective Reyes wanted to understand what lead up to the punch.

---

[9] The trial court admonished the jurors that it was up to them to decide what the video shows.

8

Detective Reyes called defendant the next day to get his mother's phone number. This call was recorded but defendant was not asked questions about the incident. No questions were asked in the recorded conversation because the detective was trying to process a lot of information. Defendant provided his mother's cell phone number as requested.

Detective Reyes called Fontaine at her work at the post office, catching her as she was rushed at the end of the work day, and conducted a recorded interview.[10] The recorded call was played for the jury. Fontaine said there was an argument, fighting and slapping, and she was kicked to the ground. Fontaine suffered a scraped elbow and hit her head on the ground. She saw Stafford getting out of the car and thought Stafford slipped on the gravel while kicking at defendant,[11] who was trying to help Fontaine get up. Stafford ended up on the ground, but Fontaine did not think she was unconscious. Stafford said she was all right but asked what happened. Fontaine drove Stafford home.

Detective Reyes testified on direct examination that he did not ask Fontaine questions about how she fell to the ground, but she did say Stafford kicked her. When asked if there was any reason he did not ask Fontaine how hard she was kicked, he explained that he ran out of time and he did not believe Fontaine was telling the truth. On cross-examination by the prosecution, the detective testified he had seen the video and believed Stafford's statement about being kicked was a lie.[12] He already knew

---

[10] Fontaine gave inconsistent testimony regarding whether she was aware of the investigation into the incident prior to receiving the call from Detective Reyes.

[11] Fontaine testified at trial that after viewing the video, she was incorrect in her belief that Stafford fell after slipping on gravel.

[12] At this point in the testimony, the jury was admonished that it is rare to have a crime videotaped, witnesses might be asked what the video shows, and "ultimately, it's your decision, you get to decide what the video shows. You get to decide what the facts are" and "it's ultimately your decision to decide what the facts are in this case, including what you see or do not see in the videotape." Later in the examination of Detective Reyes the court reiterated to the jurors that is was "for the jury to decide what is shown or not shown on the video."

9

defendant hit Stafford, so there was no need to ask questions about that. The stories given to him by defendant and Fontaine were consistent and not truthful. He saw Fontaine propelled backward, but did not see Stafford's leg extended outside the Jeep. He does not believe from the video that Stafford kicked anyone.

## DISCUSSION

### Detective Reyes's Testimony Regarding the Truthfulness of Defendant and Stafford

Over defense objections, Detective Reyes was allowed to testify that after viewing video of the charged incident, he was of the opinion Stafford did not kick anyone or slip and fall to the ground, and defendant and Fontaine were untruthful when they told him they had been kicked by Stafford. Defendant argues it is impermissible for a witness to express an opinion about the truthfulness of the statements and testimony of other witnesses. He contends the trial court gave inadequate limiting instructions regarding the opinions of Detective Reyes. Defendant further argues the trial court abused its discretion under Evidence Code section 352 by admitting the testimony. Finally, defendant contends the error is necessarily prejudicial, because the opinion testimony was ruled inadmissible at the first trial, which resulted in a hung jury.

#### Admission of Testimony Indicating a Witness is Untruthful

"'[T]he trial court has broad discretion to determine the relevance of evidence.' (*People v. Cash* [2002] 28 Cal.4th [703,] 727.) This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1149.)" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"Defendant is correct that generally a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1221.) But the

10

rule is not absolute, and "courts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*People v. Chatman* (2006) 38 Cal.4th 344, 384 (*Chatman*); *People v. Riggs* (2008) 44 Cal.4th 248, 318 ["'were they lying'" questions are proper when based on the personal knowledge of the witness].)

"In challenging a witness's testimony, a party implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed. A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable." (*Chatman*, *supra*, 38 Cal.4th at p. 382.) This rule is consistent with Evidence Code section 780, which permits the trier of fact to "consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [¶] . . . [¶] (i) The existence or nonexistence of any fact testified to by him." (See *People v. Merriman* (2014) 60 Cal.4th 1, 84.)

Improper admission of "were they lying" testimony is not prejudicial where the trial court instructs the jury on the limited purpose for admission of the evidence and the jury could disregard any testimony it found untrue. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83 [assumed error in admitting doctor's opinion as to defendant's credibility held nonprejudicial in light of jury instructions].)

### *Background*

The court and counsel discussed the permissible scope of examination of Detective Reyes, who was to be called as a defense witness after Fontaine's testimony. The prosecutor expected the defense to portray the detective as conducting an interview

biased in favor of Stafford (at her home), as opposed to the way Fontaine was interviewed (by telephone, late in her busy work day). Defense counsel[13] indicated "of course" when asked if he was "going to get into that?" The prosecutor responded that the entirety of the investigation should be admissible if the defense intended to attack the detective's investigation. Defense counsel stated he needed to call Detective Reyes to clarify that he did not ask Fontaine specific questions, but he did not intend to question him about his phone conversations with defendant. The prosecutor stated that Fontaine had lied to Detective Reyes at a time she did not know there was a video recording of the incident, by making statements to protect her son. The defense intended to argue that Stafford was accommodated by being interviewed at her home, in a police car, but Fontaine was interviewed by telephone while busy at work. The prosecutor argued the detective did try to interview defendant, and the scope and quality of his investigation is at issue. Because the defense intended to portray Detective Reyes as conducting an unfair investigation, the prosecution was entitled to elicit testimony that the detective had contacted defendant. Defense counsel denied any intent to argue about the quality of the investigation. The court noted that defendant was going to testify, so his interview statement would be admitted. The prosecutor agreed that when defendant testified, his prior statement should be admitted, so there was no basis for a finding of prejudice to the defense. Defense counsel told the court that if the prosecution was permitted to ask Detective Reyes about his interview of defendant, the defense would have to question the detective about the interview. The defense therefore intended to "set the stage" for the context of defendant's statements to Detective Reyes. The court found that acceptable, noting that the jury would be instructed that unrecorded oral admissions of a defendant should be viewed with caution.

---

[13] Defendant was represented by two attorneys at trial. We refer to defense counsel in the singular, although both addressed the trial court on this issue.

12

### *Relevant Trial Testimony and Jury Admonitions*

Called as a defense witness, Detective Reyes was questioned as to his training, experience, and report writing duties. He agreed it is always a good idea to provide as much information as possible, including a tape recording of an interview, which can be used to prepare an accurate police report. The detective was also questioned about taking notes, which he agreed could be important depending on the circumstances. It is his goal to conduct fair and impartial investigations.

Detective Reyes called defendant on September 18, 2013, after he had seen the video. He had the ability to take notes, but did not do so. He did not record the call because he did not have an attachment for the recording device and could not locate one at the police station. The purpose of the call was not to conduct an interview, but to let defendant know he was conducting an investigation and verify he had his phone number. He did not ask defendant any questions, but defendant made voluntary statements. He wanted to interview defendant at a separate time when he could record the conversation. Defense counsel on several occasions asked questions referring to Detective Reyes's "non-interview" with defendant. Defense counsel also asked, "And it is your testimony that you have the prime suspect on the phone, but you don't ask him a single question about this criminal investigation?" The report he wrote of his conversation with defendant was based solely on his memory because he took no notes. He was able to record his second call to defendant, but that call was only to obtain Fontaine's phone number and he did not conduct an interview. In response to whether he ever interviewed defendant, Detective Reyes testified he wanted to do so at the station.

Detective Reyes testified he gave both Stafford and Fontaine a fair opportunity to explain what happened, with no bias or favoritism toward Stafford. The defense established that Stafford was interviewed in a police vehicle at her home due to a large number of animals inside her home. Detective Reyes did not mention in his report that Detective Wong was present for the interview.

13

Fontaine was interviewed by telephone at her place of employment. Detective Reyes did not ask if she would meet him in person for an interview. Detective Reyes testified that Fontaine stated in her telephone interview that Stafford hit her head on the Jeep, slipped, and fell, and that Stafford had kicked her to the ground.

Detective Reyes did not ask how hard Fontaine was kicked because he ran out of time and he did not believe "Ms. Fontaine was telling me the truth of what took place that day." On cross-examination by the prosecution, Detective Reyes testified he did not believe Fontaine's statement that she was kicked and knocked down. Defense counsel objected, and in a discussion at the bench, cited authorities for the proposition that it is improper for a witness to express an opinion on the credibility of another witness. The trial court disagreed, stating that Detective Reyes was explaining where he was in the investigation, and that it would be for the jury to decide what did nor did not happen. Defense counsel asked for a limiting instruction. The court then advised the jury that it was the jury's decision as to what is shown on the video recording. Witnesses would testify about what took place, "but it's ultimately your decision to decide what the facts are in this case, including what you see or do not see in the videotape."

When cross-examination resumed, Detective Reyes testified that after reviewing the video, he believed Fontaine had lied about being kicked to the ground. Fontaine also told him Stafford fell on loose gravel, and he determined from the video that was also a lie. In response to another question he again testified the video does not reflect Stafford falling on loose gravel. Following a defense objection, the trial court again reminded the jury "to decide what the facts are here. . . . The jury gets to decide what the facts are and what the video shows or does not show."

Detective Reyes further testified he believed the stories of Fontaine and defendant were false and "not truthful." The trial court again admonished the jury that "it's ultimately for the jury to decide what is shown or not shown on the video." On re-cross examination, Detective Reyes testified that he did not believe Stafford had kicked anyone.

14

*Analysis*

We begin with two general observations. First, we reject defendant's attempt to establish both error and prejudice by comparing the different rulings made by the trial courts in the first and second trials on the propriety of the "were they lying" questions. The fact that the trial judge in the first trial precluded the "were they lying**"** questions does not establish an abuse of discretion by the second trial judge. Our task is to review the record of the second trial, in its own context, for error and prejudice.

Second, we question defendant's assertion that "[t]he critical issue at trial was whether Mr. Eulian punched Ms. Stafford after she kicked his seventy year-old mother, knocking her to the ground." The critical issue in this trial was whether defendant used a reasonable amount of force in self defense or defense of his mother. A reasonable trier of fact could conclude that Stafford had, in fact, kicked Fontaine to the ground, but that defendant's violent response was far beyond what was reasonable under the circumstances. On the other hand, a reasonable trier of fact could find that Stafford did not kick Fontaine, but under the totality of the circumstances defendant did not react with unreasonable force. The entirety of the incident was significant, but whether Stafford kicked Fontaine was not necessarily critical to the outcome.

The defense at trial sought to establish that Detective Reyes conducted an incomplete, incompetent, and biased investigation. The defense suggested the detective failed to record a conversation with defendant and did not take notes, he failed to conduct a full interview with defendant, and he showed favoritism in how he approached his interviews with Stafford and Fontaine. Defense counsel questioned Detective Reyes about his "non-interview" with defendant. Defense counsel skeptically questioned the detective about his failure to ask any questions of the prime suspect in his criminal investigation.

Given this context, we conclude the trial court did not abuse its discretion in permitting Detective Reyes to explain that his investigation was driven, in part, by his

15

determination that the descriptions of the incident offered by defendant and Fontaine were untruthful in light of what he perceived on the video recording. The trial court could reasonably conclude that it was relevant for the prosecution to explain why the detective did not ask certain questions, clarify points, and conduct further interviews. Moreover, the jury had no need to rely on Detective Reyes' testimony that defendant and Fontaine were untruthful when they told him Stafford fell and hit her head. The video recording indisputably established that their descriptions of the manner in which Stafford was injured were false, as the recording establishes beyond question that Stafford was injured by the punches thrown by defendant. Viewed in this light, the testimony by Detective Reyes that defendant and Fontaine were not truthful in describing how Stafford was injured does not come within the prohibition against questions asking whether a witness who testified at trial was lying.

The trial court's ruling permitting Detective Reyes to testify that the recording did not show Stafford kicking Fontaine presents a somewhat different issue. Unlike the question of whether Stafford was injured by a fall or punches to the head, the video is ambiguous on whether she kicked Fontaine—when viewed in slow motion, Stafford's foot is visibly raised, but whether a kick connected, or whether Fontaine was propelled backward from the force of a shove by defendant as he punched Stafford in the car, is not clear. But even assuming this portion of Detective Reyes' testimony should not have been admitted, we conclude it was not prejudicial. The jury already knew defendant and Fontaine had been untruthful, at least in part, when they told Detective Reyes that Stafford slipped and hit her head on the car. The trial court repeatedly admonished the jury during the testimony of Detective Reyes, and at other times during the trial, that the jury was to decide the facts and what was shown by the video. A computer was provided for the jury to view the video during deliberations, and there is no reason to believe the jury did not make an independent determination of what was shown on the recording. And the ultimate issue was not whether Stafford kicked Fontaine; instead, the critical issue in this case was whether defendant used unreasonable force. There is strong evidence supporting a finding defendant used force well in excess of that which would

16

have been reasonable when he pulled Stafford from the Jeep and punched her into unconsciousness.

We also conclude that the approach of the trial court was not inherently prejudicial to the defense. Had the jury determined that Detective Reyes was incorrect in his interpretation of the video, the jury could have rationally concluded that his investigation was incomplete and unfair, which would have been damaging to the prosecution. Given the ambiguity of the video, the mere fact Detective Reyes branded Fontaine untruthful regarding the kick could have resulted in the jury discrediting his investigation. The disputed testimony had as much potential to be prejudicial to the prosecution as to defendant. We are satisfied that any error was not prejudicial. (Cal. Const., art. VI, § 13.)

**Limitation on Self-Defense under CALCRIM No. 3472**

Defendant argues the trial court committed prejudicial error by instructing the jury on self-defense pursuant to CALCRIM No. 3472, because *Ramirez*, *supra*, 233 Cal.App.4th 940 held that the instruction "misstates the law of self-defense, erroneously preventing the jury from considering a self-defense claim by instructing the jury categorically that a person does not have the right to self defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Defendant also argues there was no factual support for the instruction. We reject the contention because: the California Supreme Court has held that the instruction is a correct statement of law; defendant overstates the holding of *Ramirez*; the instruction was proper under the facts of this case; and defendant has not established prejudice.

*Background*

17

The trial court apparently had decided[14] to instruct the jury pursuant to CALCRIM No. 3472, which provides as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Before instructions were read, defense counsel stated, "This was an instruction requested [by the prosecution] over my objection. I think for consistency--the way it reads now is confusing--you probably should add the phrase: to self-defense or defense of another because that's what the defense is in this case." The prosecutor did not object to the modification, and the court made the change suggested by defense counsel. The jury was instructed, "A person does not have the right to self-defense or defense of another if he or she provokes a fight or quarrels with the intent to create an excuse to use force."

### *Contrived Self-Defense*

In *People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*) our Supreme Court explained that the self-defense doctrine "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." In *Enraca*, "the trial court instructed the jury on the law as we have just explained it. It gave CALJIC No. 5.55: 'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.'" (*Ibid.*) While *Enraca* involved the CALJIC analog to CALCRIM No. 3472, the language of the two instructions is materially the same. CALCRIM No. 3472 is therefore generally a correct statement of law. (*Auto Equity Sales, Inc., v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Ramirez*, *supra*, 233 Cal.App.4th at page 947, acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances. Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an

---

[14] The proposed jury instructions were not discussed on the record.

attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. (See, e.g., *Fraguglia v. Sala* (1936) 17 Cal.App.2d 738.)"

The *Ramirez* court, however, found error in CALCRIM No. 3472 under the facts of that case. There was evidence in *Ramirez* that gang members, including the defendant, sought out a rival gang for the purpose of an assault, but when the defendant believed a rival gang member had a weapon, he responded with deadly force. Over a lengthy dissent by Justice Fybel, the *Ramirez* court concluded that "CALCRIM No. 3472 under the facts before the jury did not accurately state governing law. The blanket rule articulated in CALCRIM No. 3472 and reiterated by the prosecutor effectively told the jury, 'A person does not have [*any*] right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [*any*] force.' In effect, the prosecutor and the trial court advised the jury that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ramirez*, *supra*, 233 Cal.App. at p. 947.) Under the facts in *Ramirez*, "the instruction made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 945.)


*Analysis*


First, the trial court did not err in instructing the jury with the modified version of CALCRIM No. 3472. The instruction is a correct statement of law. (*Enraca*, *supra*, 53 Cal.4th at p. 761; *Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.) Although "[t]he instruction misstates the law" according to *Ramirez*, *supra*, 233 Cal.App.4th at p. 950, we believe the opposite is true. CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force.

Second, defendant reads far too much into *Ramirez*, which has no application to

19

the facts in this case. The *Ramirez* court was concerned with a defendant's use of deadly force in self-defense. Defendant's claim of self-defense and defense of another in this case was not based on his use of deadly force. On its face, the analysis in *Ramirez* has no application here.

Third, defendant's argument that there is no factual predicate for CALCRIM No. 3472 in this case is incorrect. The jury could rationally conclude that defendant provoked the conflict, and that he continued to be the aggressor until Stafford responded, at which point defendant knocked her out with a series of punches. It is undisputed that defendant walked 40 feet to confront Stafford in her Jeep. As defendant screamed and jabbed his finger repeatedly toward Stafford's face, she leaned away, and eventually threw kibble in his direction. Defendant continued to argue with Stafford and gesture toward her, even as his mother tried to pull him away. Assuming defendant is correct that he and his mother were kicked by Stafford, if the jury determined that Stafford did so in response to defendant's aggressive conduct, defendant did not have the right to use force to settle a physical confrontation he arguably created. We do not suggest Stafford was blameless in this incident. It would be generous to say that her conduct left much to be desired. Nonetheless, defendant's conduct did provide a factual predicate for instructing with the modified version of CALCRIM No. 3472.

Fourth, assuming there was error, defendant did not suffer prejudice under either federal or state law. As stated earlier in this opinion, the ultimate issue was whether defendant used unreasonable force upon Stafford by forcibly removing her from the Jeep and punching her into unconsciousness. If CALCRIM No. 3472 was erroneously given because it was irrelevant under the facts, the error is merely technical and not grounds for reversal. (See *People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Rowland* (1992) 4 Cal.4th 238, 282.) Defendant recognizes that during argument to the jury the prosecutor never even mentioned CALCRIM No. 3472, or the principle explained in the instruction. Instead, the prosecutor directed the jury to the ultimate issue on self-defense in this case by arguing it "all really boils down to this one word here, reasonable." The prosecutor explained over the course of five pages in the reporter's transcript why defendant's

conduct was unreasonable, including that defendant "went to overkill, an overwhelming amount of violence in response to what he's testified to. . . ." We conclude both that the instruction did not improperly affect the verdict, nor is it reasonably probable defendant would have obtained a more favorable result had CALCRM No. 3472 not be given. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## Evidentiary Rulings

Defendant contends the trial court committed two evidentiary errors, which cumulatively resulted in prejudice requiring reversal. First, he argues the court erred by excluding testimony by Ronald Richard that Stafford had been aggressive and belligerent one week before the charged incident when he attempted to speak to her about feeding the feral cats. Second, he contends the trial court erred by allowing the prosecution to introduce the anonymous 9-1-1 reporting the incident. We conclude defendant has not shown error or prejudice from either ruling.

### *Richard's Testimony*

Defense counsel requested permission to question Richard about his contact with Stafford one week prior to the charged incident. Specifically, counsel requested to have Richard testify to his interaction with Stafford "before Mr. Eulian arrived on the scene." Richard's proffered testimony would be that he had an interaction with Stafford, he told her not to feed the cats and she started calling him names, and then defendant arrived and interceded in the conversation, and in the end Stafford agreed to feed the cats down the alley. The prosecutor objected to the proposed testimony, arguing introduction of the "volatile conversation" with a third party was irrelevant. The trial court permitted the defense to call Richard as a witness to say he had a conversation with Stafford and then defendant arrived, but the court excluded the details (the "history, yelling, screaming and

21

cussing") because the event had occurred one week before the charged incident. Defense counsel argued the evidence was admissible because Stafford testified untruthfully that Richard was not even there, but the court maintained its position that the interaction between Richard and Stafford a week before was inadmissible. Richard later testified before the jury that one week before September 14 he saw a Jeep in the alley, he had an interaction with the woman about feeding the feral cats, and defendant arrived and also spoke to her. Defendant testified that he saw Stafford arguing with Richard the week before the incident, and when Richard explained the problems caused by the cats, Stafford stated, "this is my motherfucking neighborhood." Defendant approached Stafford, who yelled at him before they discussed the problem with the cats and the argument concluded with Stafford saying she would feed the cats down the alley, although defendant did not believe that would solve the problem.

Defendant argues on appeal that Richard's testimony was relevant and exclusion of the evidence prevented the defense from presenting its entire theory to the jury, in violation of the Sixth Amendment right to present a defense. He argues that Richard's interaction with Stafford, one week before the charged crimes, was relevant to her credibility, because Richard was the only independent witness who could corroborate defendant's testimony that Stafford was angry and belligerent the week before when he tried to discuss the problems with the cats. Defendant reasons that the evidence had a tendency to prove that Stafford was the aggressor. Defendant makes the additional argument that Stafford's earlier conduct was admissible under Evidence Code section 1103, subdivision (a)(1), to prove Stafford's character and establish that she was the aggressor. Finally, defendant argues the evidence was not subject to exclusion under Evidence Code section 352.

*Analysis*

"Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason

22

to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.) Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. (*People v. Clark* [(2011] 52 Cal.4th [856,] 893.) An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' (*People v. Brown* [(2003)] 31 Cal.4th [518,] 534.)" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Defendant fails to show an abuse of discretion in the trial court's decision to exclude the details of Richard's interaction with Stafford, both on relevance grounds and under Evidence Code section 352. The trial court could reasonably conclude that the testimony of defendant, his mother, and Stafford was sufficient to resolve the material issues at trial, particularly since a clear video depiction existed as to the charged offense. As we have noted several times, the key issue in this case was the reasonableness of the force used by defendant on Stafford. Testimony by Richard as to the interaction with Stafford a week earlier, at a time before defendant had appeared on the scene, did not tend to prove or disprove the reasonableness of defendant's use of force sufficient to render Stafford unconscious. Moreover, this is not a case in which the jury was presented with a one-sided view of the facts. Stafford's belligerence is apparent in both the video and her testimony. Defendant was permitted to testify to his observations of Stafford's conduct on the night of her interaction with Richard. The trial court's decision to focus the jury's attention on the evening of the charged incident, rather than what had occurred a week earlier outside of defendant's presence, was not arbitrary, capricious, or patently absurd.

Defendant's further argument that Richard's full account of his contact with

23

Stafford should have been admitted to show Stafford's character, and accordingly, the reasonableness of defendant's use of force, is forfeited. This issue was not raised in the trial court as a basis for admission, and it may not be considered for the first time on appeal. "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' Pursuant to this statute, '"we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."' (*People v. Partida* (2005) 37 Cal.4th 428, 433–434.)" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21.)

Assuming the trial court erred, defendant cannot show prejudice. Defendant's claim that he was denied the ability to present a complete defense, in violation of the Sixth Amendment to the United States Constitution, is belied by trial record. Defendant was afforded a full and fair opportunity to present his version of what occurred leading up to the punches he delivered to Stafford. We are satisfied the jury had an understanding of how defendant and his mother perceived the events.

### The Anonymous 9-1-1 Call

The prosecution filed a pretrial motion seeking to introduce the anonymous 9-1-1 call made on the night of the incident as a spontaneous statement pursuant to Evidence Code section 1240. Defense counsel objected on the ground the caller was not speaking from personal knowledge because she had not seen the incident. The prosecutor responded that the caller was a percipient witness who was not involved on either side, and who corroborates the video and Stafford's expected testimony. The court stated it was unclear whether the caller saw the assault but it was clear that she observed the victim lying on the ground bleeding. The court granted the prosecutor's motion to introduce the call, reasoning that because of the existence of the videotape, the recorded call was not unduly prejudicial. Although the court expressed the view that caller did not

24

personally see the incident, she saw the aftermath as she walked through the alley, including that Stafford was bleeding and had been knocked out.

Defendant argues the 9-1-1 call did not comply with requirements of Evidence Code section 1240 because the caller did not personally perceive what took place. He claims there is no evidence the caller actually witnessed the incident.

*Analysis*

"To qualify for admission under the spontaneous statement exception to the hearsay rule, 'an utterance must first purport to describe or explain an act or condition perceived by the declarant. (Evid. Code, § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.,* subd. (b).)' (*People v. Farmer* (1989) 47 Cal.3d 888, 901 (*Farmer*), disapproved on other grounds in *People v. Waidla* [(2000)] 22 Cal.4th [690,] 724, fn. 6.) For purposes of the exception, a statement may qualify as spontaneous if it is undertaken without deliberation or reflection. (See *Farmer, supra,* at p. 903.) Although we have acknowledged that responses to detailed questioning are likely to lack spontaneity, we also have recognized that an answer to a simple inquiry may be spontaneous. (*Id.* at p. 904, citing cases.) The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter. (*Id.* at p. 904.)" (*People v. Morrison* (2004) 34 Cal.4th 698, 718-719.) At issue here is whether the 9-1-1 caller personally perceived the events described in the call.

Our review of the 9-1-1 call, in conjunction with the video of the incident, leads to the conclusion the trial court did not err in admitting the call. The anonymous caller to 9-1-1 reported that she had heard screaming and walked in the alley and did not get too close. The video of the incident shows a woman walking into the alley just as defendant delivers the final punch to Stafford's head. The woman walks through the alley, staying on the opposite side of the Jeep, away from defendant and Fontaine. The caller stated that "somebody has jumped on the, the lady and knocked her out," which is consistent

with what the woman would have seen as she walked toward the alley. The caller stated the woman was bleeding and knocked out, and was outside of her truck, which is entirely consistent with the video. The woman said she could not get close— "I walked by you know, but didn't get too close"—a description consistent with the woman walking on the far side of the alley to avoid the fray. Finally, the caller displayed her personal knowledge by telling the 9-1-1 operator, "I heard some screaming and hollering as I was coming towards . . . [coming] east. And I went to see."

Given this record, we are satisfied the declarant who called 9-1-1 spoke with personal knowledge of events she perceived. We further hold admission of the 9-1-1 call, if error, was not prejudicial. The caller merely reiterated what was already clearly shown on the video of the incident. She did not state any facts about what might have preceded the physical altercation between defendant and Stafford. Her statement that yelling was taking place was overwhelmingly established by other testimony. A result more favorable to defendant is not reasonably probable in the absence of the 9-1-1 call. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)


**Alleged Prosecutorial Misconduct**


The same prosecutor presented the first and second trial against defendant. According to defendant, the prosecutor knew he was unlikely to obtain a conviction on retrial without "Detective Reyes' inadmissible opinion testimony." Defendant argues the prosecutor knew the detective's opinions were inadmissible and his purported reason for introducing the evidence was "disingenuous." Further, defendant argues the prosecutor misstated the law and impugned the integrity of defense counsel by arguing that the purpose of character evidence was to "play on your sympathies" and "consider things outside of the evidence." Finally, defendant contends this court should reach the merits of these claims despite the absence of an objection.

These contentions do not require extended discussion. First, "[w]e begin by noting the rule requiring claims of prosecutorial misconduct be preserved for appellate

26

review by a timely and specific objection and request for admonition is well established (see, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1205; *People v. Whalen* (2013) 56 Cal.4th 1, 52; *People v. Clark* (2011) 52 Cal.4th 856, 960; *People v. Gonzales and Soliz* [(2011)] 52 Cal.4th [254,] 305; *People v. Wilson* (2008) 44 Cal.4th 758, 800; *People v. Cole* [(2004)] 33 Cal.4th [1158,] 1201; *People v. Hill* [(1998)] 17 Cal.4th [800,] 820; *People v. Benson* (1990) 52 Cal.3d 754, 794) and long settled (see, e.g., *People v. Brice* (1957) 49 Cal.2d 434, 437; *People v. MacDonald* (1914) 167 Cal. 545, 551; *People v. Ah Fook* (1883) 64 Cal. 380, 383)." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1340–1341.) Defendant concedes no objection was made in the trial court on the ground of prosecutorial misconduct. The contention is forfeited.

Second, we find no basis for prosecutorial misconduct. There is no basis to conclude the prosecutor presented false evidence. Detective Reyes was consistent in his testimony that he did not see Stafford deliver kicks on the video, and that defendant's and Fontaine's versions of how Stafford was injured were false. The latter portion of his testimony is beyond dispute based on what is unambiguously shown on the video. The issue of admissibility of Detective Reyes' opinion testimony was fully litigated outside the presence of the jury. The trial court ruled the testimony admissible. Presentation of evidence sanctioned by the trial court does not constitute misconduct.

Third, we find nothing in the argument of the prosecutor to the jury that rises to the level of misconduct. The few snippets of argument cited by defendant on appeal are taken out of context and do not fairly represent the arguments as presented. In any event, "[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 768; *People v. Cole* (2004) 33 Cal.4th 1158, 1203.) The prosecutor's argument regarding character evidence falls within the wide latitude afforded to argue the weight and significance of the evidence.

Fourth, we hold defendant has not carried his burden of establishing prejudice. "'A defendant's conviction will not be reversed for prosecutorial misconduct' that

27

violates state law, however, 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; *People v. Bolton* (1979) 23 Cal.3d 208, 214 ["in the absence of prejudice to the fairness of a trial, prosecutor misconduct will not trigger reversal"].)

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.

We concur:


TURNER, P.J.


BAKER, J.