Filed 9/6/16  P. v. Brauns CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANK BRAUNS,<br><br>    Defendant and Appellant. | D067811<br><br><br>(Super. Ct. No. SCN337075) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Allison Hawley and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Frank Brauns of inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a); count 1)[1] and false imprisonment by violence or menace (§§ 236, 237, subd. (a); count 2). As to both counts, the jury found true allegations Brauns personally used a claw hammer as a deadly weapon (§ 1192.7, subd. (c)(23)) and personally inflicted great bodily injury (§§ 1192.7, subd. (c)(8), 12022.7, subd. (e)). As to count 2, the jury also found true an allegation Brauns personally used a knife as a deadly weapon (§ 1192.7, subd. (c)(23)). In a bifurcated proceeding the court found true allegations Brauns had one prior strike conviction and one prior serious felony conviction (§§ 667, subds. (a)(1) & (b)-(i), 668, 1170.12, 1192.7, subd. (c)) from an out-of-state incident. The court sentenced Brauns to 14 years in prison for count 1 based on double the middle term for six years plus three years for the personal infliction of great bodily injury enhancement and five years for the serious felony enhancement. The court stayed a three-year sentence for count 2 pursuant to section 654.

Brauns contends on appeal his conviction for count 1 should be reversed because the court instructed the jury with CALCRIM No. 3472, which he contends misstates the law on self-defense, and failed to sua sponte instruct the jury with CALCRIM No. 3471 on the right of self-defense for an initial aggressor. Brauns also contends there was no substantial evidence to prove false imprisonment by violence or menace in violation of his federal right to due process. We conclude there was no prejudicial instructional error

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

and there was substantial evidence to support felony false imprisonment. We affirm the judgment.

FACTUAL BACKGROUND

A

Brauns married Jordana Erler in October 2013. Brauns was violent with Erler on two occasions in February 2014 while she was pregnant. On one occasion, he pulled her out of bed by her leg, threatened her with a knife, punched her and choked her. She called the police, but hung up before speaking with anyone. A few days later, Brauns again became violent. He pulled her out of bed by her leg again and threatened her with a knife by holding it to her stomach. She contacted the police and Brauns was taken to jail. Erler obtained a restraining order against him. Erler had Brauns' son in August 2014. The child was taken into custody by child protective services when he was born.

B

On the night of September 21, 2014, Erler allowed Brauns to stay with her because he was complaining about pains and lack of transportation. They discussed the need for Brauns to get services to get their child back. Erler told Brauns he needed to leave first thing in the morning.

The next morning, Erler woke Brauns and told him he had to leave. Brauns said he could leave when he wanted. When she urged him to get up, he got up and started screaming, "Where's my son?" She screamed back at him saying he knew where their son was and told him he needed to go. They started pushing each other. While she was lying down he got over her and she pushed him back with her feet. She said if he did not

3

leave peacefully, she would call the police. He grabbed the mobile phone out of her hand and threw it against a wall where it broke.[2]

Erler ran toward the living room to grab the home phone when she heard the garage door shut. When she thought he had left, Brauns came back in and hit her left temple with a hammer as she was standing in the hallway. Because she was bleeding, she went into the bathroom to wash away the blood and wrapped a towel around her head as tightly as she could.

When Erler came out of the bathroom, her roommate was peeking out of her door and Erler told her to "[c]all the cops." When Brauns saw the roommate, he told her to stay out of their business.

Erler testified Brauns pushed or pulled her into the bedroom and blocked her exit. He had a hammer in his hand. He pulled a chair in front of the door and sat down. He pushed her down on the bed several times and she asked him why he was doing this. She noticed he had a knife in his hand and he looked relentless. He said, "I'm going to end your life if you move again. Stay put. You're done. This is over."

C

Erler's roommate called 911 and reported she awoke to hear Erler and her husband fighting and screaming. Erler yelled for the roommate to call the police. The roommate

---

[2] Although the mobile phone was not found during the police investigation, the officer had not looked for it.

told the 911 dispatcher she did not want to become involved because she had already gotten in trouble because of this guy.[3]

When officers arrived, the roommate came out and met them in the driveway. She appeared nervous and very concerned about what was going on in the house. She said she awoke to hear Erler screaming to call the police and it sounded like Brauns was hurting Erler. The roommate gave them permission to enter the house and confirmed the bedroom in which she heard the altercation.[4]

## D

The officers did not hear anything when they entered the house. When they reached the bedroom, one of the officers knocked on the door. He heard a man's voice, which sounded angry, saying, " 'Who is it?' or 'What do you want?' " When the first officer announced it was the police and asked for the door to be opened, he heard a woman start screaming loudly like she was being hurt. The officer tried the door, which was locked, and then broke open the door.

Erler testified Brauns attacked her again with the hammer when the police knocked on the door. Brauns also jabbed her with a knife, leaving a mark on her chin.

---

[3]    The parties stipulated the roommate was arrested a month earlier for misdemeanor battery, misdemeanor resisting arrest, and misdemeanor under the influence of a controlled substance with Brauns as the alleged victim. No criminal charges were filed.

[4]    The second officer had a body camera on his chest, which he activated shortly after they arrived at the scene. Footage from the incident was shown to the jury.

The first officer saw a female with a male behind her and it looked like a struggle was going on. Since he heard the female scream, the officer grabbed the male and carried him down to the bed. The room was dark other than the flashlight the officer was carrying. The officers took Brauns into custody.

E

Erler's hair was soaked in blood. She reached to pick up the hammer from the floor. When an officer told her to put it down, she complied. A globe light cover from the ceiling fan was broken on the floor. Erler stated it was broken by the hammer during the incident.

Erler told the officers Brauns tried to kill her. Brauns responded, "Shouldn't of come at me with that fucking hammer." Erler said, "I were[?]" Brauns said, "Yes, you were." Erler said, "No, I wasn't." Erler then said, "Why the fuck you try to kill me, Frank?" Brauns said, "Just defending myself against you, psycho."

As they were waiting for paramedics, Erler told one of the officers Brauns hit her with the hammer earlier and she tried to call the police. She said the incident started when she told him to get up and go to work. He came out of the garage with a hammer and hit her before the police arrived. She screamed for her roommate to call the police. She said she went back inside to try to calm him down and he said she was dead if the police came. When the police arrived and knocked on the door, she said he took the hammer and hit her as hard as he could with the pointed end of the hammer.

F

The lacerations on the back portion and top of Erler's head appeared to match the claw end of the hammer. Erler received numerous staples to close the lacerations on her head. She had bruises on her body, back, shoulders and arms, mostly on the left side. She also had a superficial laceration in her jaw area, consistent with a sharp object.

A blood-like substance was on the neck of the hammer. A knife was found on the nightstand with the blade under a spoon and the handle sticking out. The knife appeared to have blood on the blade. There was blood on a pillow on the bed.

There was blood on the ceiling by the ceiling fan and above the nightstand. There was blood in the hallway. There was also blood on the carpet in the bathroom. There was blood on a towel in the bathroom and quite a bit of blood in the bathtub. It appeared some of it had washed away. There was also blood on the toilet seat.

Brauns was not injured in the incident. He had a scratch on one hand and some scratches on his back. He had blood on his body and his clothes. Brauns did not appear scared or shaken, but he seemed "a little bit irrational" to the officer and very calm.

DISCUSSION

I

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. [Citation.] 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the

7

defense is not inconsistent with the defendant's theory of the case.' " ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) We independently review "whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The court instructed the jury with CALCRIM No. 3470 regarding the right to self-defense, CALCRIM No. 3472 regarding the fact self-defense may not be contrived, and CALCRIM No. 3474 regarding the limitation of the right to self-defense for only as long as the danger exists. In discussing the self-defense instructions, defense counsel objected to CALCRIM Nos. 3472 and 3474 stating there was no evidence to support those instructions. The court expressed its intention to provide all information related to self-defense. There was no discussion regarding the use of CALCRIM No. 3471 regarding initial aggressor or mutual combat.

A

Brauns contends the court erred in giving CALCRIM No. 3472 because it is a misstatement of the law of self-defense. We disagree.

CALCRIM No. 3472 states, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." The Supreme Court has explained ordinarily the self-defense doctrine, which is " 'applicable when a defendant *reasonably* believes that his safety is endangered[,] may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his

8

adversary's attack or pursuit is legally justified.' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) The *Enraca* court concluded CALJIC No. 5.55, which is materially the same as CALCRIM No. 3472, was a correct statement of the law. (*Ibid.*)

In *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 (*Eulian*) Division Five of the Second District Court of Appeal distinguished the case Brauns relies upon, *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) from Division Three of the Fourth District Court of Appeal. "There was evidence in *Ramirez* that gang members, including the defendant, sought out a rival gang for the purpose of an assault, but when the defendant believed a rival gang member had a weapon, he responded with deadly force. Over a lengthy dissent by Justice Fybel, the *Ramirez* court concluded that 'CALCRIM No. 3472 under the facts before the jury did not accurately state governing law." (*Eulian*, *supra*, 247 Cal.App.4th at p. 1333.)

In *Ramirez,* the prosecution repeatedly argued the plain terms of CALCRIM No. 3472 meant even if "defendants sought to provoke only a fistfight, their bare intent 'to use force' … forfeited a claim of imperfect self-defense." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 943.) The *Ramirez* court recognized "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances. … [A] victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. [Citation.] And when a defendant contrives a 'deadly' assault [citation], there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-

9

defense against those deadly measures." (*Id.* at p. 947.) However, the *Ramirez* court held it was error for the prosecution and the trial court to advise the jury in that case "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ibid.*) Under the facts before it, the court concluded CALCRIM No. 3471 "made no allowance for an intent to use only non[-]deadly force and an adversary's sudden escalation to deadly violence." (*Id.* at p. 945.)

In *Eulian*, *supra*, 247 Cal.App.4th at page 1334, the Second District concluded "CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force." The *Eulian* court found *Ramirez* had no application to the case before it, which involved an altercation between neighbors resulting in the defendant knocking the victim out with a series of punches. The court concluded the defendant's conduct in that case provided "a factual predicate for instructing with the modified version of CALCRIM No. 3472." (*Ibid.*)

In this case, defense counsel argued there was no evidence of provocation for CALCRIM No. 3472. Even if there was evidence of provocation, in contrast to *Ramirez,* neither the prosecution nor the defense mentioned CALCRIM No. 3472 in closing statements or suggested Brauns had forfeited a right to claim self-defense by provoking the incident. Instead, the prosecution argued the facts did not support a claim of self-defense because Brauns' version of events was unbelievable and not supported by the physical evidence of Erler's injuries, the blood found throughout the house, and Brauns' demeanor when the officers entered the room. Using CALCRIM No. 200, the court

10

advised the jury some instructions may not apply and they should apply instructions only to the facts the jury found true. We presume the jury understood and followed the instruction. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.)

"If CALCRIM No. 3472 was erroneously given because it was irrelevant under the facts, the error is merely technical and not grounds for reversal." (*Eulian*, *supra*, 247 Cal.App.4th at p. 1335.) "We conclude both that the instruction did not improperly affect the verdict, nor is it reasonably probable defendant would have obtained a more favorable result had CALCRM No. 3472 not been given." (*Ibid.,* citing *Chapman v. California* (1967) 386 U.S. 18, 24 & *People v. Watson* (1956) 46 Cal.2d 818, 836.)

B

Brauns also contends the court erred in failing to sua sponte instruct the jury with CALCRIM No. 3471 regarding the right to self-defense in mutual combat. We conclude there was no prejudicial error.

CALCRIM No. 3471 states: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:

"1. (He/She) actually and in good faith tried to stop fighting; [AND]

"2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.) *<Give element 3 in cases of mutual combat.>* [AND

"3. (He/She) gave (his/her) opponent a chance to stop fighting.]

"If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

11

"[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

"[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

Erler testified there was an initial verbal argument and some pushing between Erler and Brauns. After the officers took Brauns into custody, Erler asked Brauns why he tried to kill her. Brauns said she should not have come at him with the hammer. Brauns did not testify, but in his interview with the investigating officer Brauns stated Erler came at him with a hammer and a knife and tried to kill him, but he was trained by Navy Seals and took the hammer away from her. Brauns said he hit her on the head "a couple of times." After Erler went to the bathroom and came back in the bedroom, Brauns said she had a cigarette and then grabbed the knife. He said he hit her on the head again with the hammer.

Assuming, without deciding, there was sufficient evidence of mutual combat to justify giving some version of CALCRIM No. 3471, there was no substantial evidence to support giving the bracketed portion of the instruction regarding a right to use self-defense when a defendant who used only non-deadly force is met with such sudden and deadly force the defendant could not withdraw from the fight. "[T]his qualification only

12

applies where the defendant commits a simple assault. [Citations.] '[I]f one makes a *felonious* assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay [or injure] his adversary in self-defense unless he has first, in good faith, declined further combat, and has fairly notified [her] that he has abandoned the affray.' " (*People v. Salazar* (2016) 63 Cal.4th 214, 249.)

Even if the version of the events, offered by Brauns was believable, it did not support a finding of only simple assault. After removing the hammer from Erler, Brauns still hit her in the head multiple times, on at least two occasions. After a lull in the action when Erler visited the bathroom and returned to the bedroom, Brauns did not decline further combat or abandon the fight. Instead, by his own admission, he hit her in the head with a hammer again when she picked up a knife. Brauns's description of the second event did not describe a situation so sudden or deadly to suggest he could not withdraw from the fight without resorting to deadly force. Additionally, if this second incident occurred as the police were entering the room, as Erler testified, there would be no need to resort to deadly force in self-defensive. Therefore, there was no evidence to support the instruction as to the second incident in which Brauns admitted hitting Erler in the head with the hammer.

Additionally, the physical evidence did not support Brauns's version of the events. Erler had numerous injuries to the back of her head as well as to her back and forearm. Blood was found spattered around the room and on the walls in the hallway. Therefore, we conclude it is not "reasonably probable defendant would have obtained a more

13

favorable result" even if CALCRIM No. 3471 had been given.  (*Eulian*, *supra*, 247 Cal.App.4th at p. 1335, citing *Chapman v. California*, *supra*, 386 U.S. at p. 24 & *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## II

Brauns also contends there was insufficient evidence to support his conviction for count 2, false imprisonment by violence or menace because there was no evidence corroborating Erler's testimony.  We disagree.

## A

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

14

Before an appellate court may reject the statements given by a witness at trial who the jury has chosen to credit, " ' "there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." [Citations.]  Such cases are rare indeed.' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728-729.)

B

"False imprisonment is defined in section 236 as 'the unlawful violation of the personal liberty of another.'  Section 237 provides the offense is punishable as a felony if, and only if, it is effected by 'violence, menace, fraud, or deceit.' " (*People v. Babich* (1993) 14 Cal.App.4th 801, 806.)  CALCRIM No. 1240, which Brauns admits correctly sets forth the elements of the offense, defines "violence" as "using physical force that is greater than the force reasonably necessary to restrain someone" and defines "menace" as "a verbal or physical threat of harm[, including use of a deadly weapon].  The threat of harm may be express or implied."

In this case, there was substantial evidence from Erler's testimony that Brauns falsely imprisoned her by violence and/or menace.  She stated he pushed or pulled her into the bedroom after she went to the bathroom.  This testimony alone was sufficient to support the conviction for false imprisonment by violence.  "The additional force required for felony false imprisonment, as opposed to misdemeanor false imprisonment, may come in the form … of simply pulling a victim toward a location when the victim's liberty has already been violated." (*People v. Ghipriel* (2016) 1 Cal.App.5th 828, 834.)

15

Additionally, there was no evidence suggesting Erler's testimony regarding the course of events once she was back in the bedroom was physically impossible or obviously false.  The first responding officer testified the door was locked when he tried it and he heard a female scream as if she was being hurt once he announced that police were present.  This supports Erler's version of the events.  The fact the weapons were not in Brauns' hands at the moment the police broke through the door does not mean her version of the events was physically impossible or obviously false.  The fact the chair was not shown in the photographs at trial does not mean the chair did not exist.  As Erler stated, the chair could have been behind the door.  Neither officer was questioned about whether they looked for a chair in their investigation.  Therefore, we conclude there is no basis to set aside the jury' s verdict.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

IRION, J.

16