Filed 5/21/21  P. v. Romeroarevalo CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B306101 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA453479) |
| v. | |
| JOSE ROMEROAREVALO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed as modified.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Jose Romeroarevalo of second-degree murder for the stabbing death of Jose Rodriguez. On appeal, he argues the trial court committed several instructional errors. We find no error warranting reversal. We correct mistakes in the abstract of judgment and affirm.

## BACKGROUND

Rodriguez was killed on the evening of January 2, 2017, when appellant and an accomplice Jose Peralta[1] confronted him outside his apartment after an earlier dispute at a nearby liquor store.

On that day between 4:00 and 5:00 p.m., Rodriguez went to Toni's liquor store, which was two or three blocks away from his apartment. He was under the influence of alcohol.

At the time, Peralta was behind the store fixing a flat tire on his truck with his brother Pablo[2] and a friend Gustavo Cabuto. Another Peralta brother Miguel and appellant's nephew Henry Romero were across the street riding skateboards. Appellant was not there, but his truck was parked nearby.

Rodriguez drove up to Miguel and Henry, asking if they had keyed his car because he saw skaters do it and run off. They denied it. Rodriguez then made a u-turn and accused Pablo of keying his car and told Pablo to come with him. Gustavo told Rodriguez he would buff out any scratches.

---

[1] Peralta and appellant were tried together before separate juries. Peralta is not a party to this appeal.

[2] We refer to certain individuals by first name to avoid confusion.

Henry called appellant to tell him they were having problems with a man who would not leave them alone and had tried to take Pablo. Rodriguez drove away.

Appellant arrived on a bicycle. Miguel, Henry, and Pablo left in appellant's truck, and appellant and Peralta stayed behind. They said they planned to go to Peralta's apartment, which was near Rodriguez's apartment.

Instead, appellant and Peralta parked outside Rodriguez's apartment. Appellant went up to Rodriguez's door and knocked. Rodriguez's girlfriend Roxanne Solario answered, and appellant told her he wanted to speak with her husband about fixing a car. Rodriguez stepped outside and Solorio followed. Rodriguez and appellant were talking normally as appellant walked backward toward Peralta's truck that was sitting with both doors open.

Solorio followed them to the back of the truck and saw Peralta. Peralta gave her the "ugliest, meanest look, like he was going to do something to" her, so she backed off. Appellant was facing Rodriguez, and Peralta was behind him. Solorio didn't see what happened next; instead, she ran to the back of the apartment building to look for help. She was gone for 30 to 40 seconds before running back to the truck.

When she returned, she saw Rodriguez hunched over in pain. A kitchen knife with an eight-inch blade fell to the ground. Appellant picked up the knife and held it in the air as Rodriguez reached for it. Appellant then passed the knife to Peralta, who stabbed Rodriguez twice in the neck. Just before Rodriguez fell, one of them stabbed him in the side.

Appellant and Peralta got in the truck, which wouldn't initially start. Solorio ran to a neighbor's apartment for help.

3

As she was waiting for the ambulance, the truck started and appellant and Peralta drove away.

Rodriguez died at the hospital that night. He suffered six stab wounds—two to the neck; one in the chest; one in the abdomen; and two in the back. Four were fatal. He also suffered a defensive wound to his left ring finger. He had no injuries to his knuckles consistent with punching another person. At the time of his death, he had cocaine and a "considerable" amount of alcohol in his system, as well as a minimal amount of marijuana.[3]

Appellant and Peralta were arrested four days later in Bakersfield. Peralta's truck had a paper plate and no back license plate. About three weeks prior to the stabbing, Peralta was pulled over in the truck, and it had a back license plate then. Red stains were found in the truck. Peralta had no injuries on him except a small scratch on his pinky finger. Appellant had no injuries on him except faint burn marks on his left arm and a cut on his right palm, which he claimed to have sustained at work.

Testifying on his own behalf, appellant admitted to stabbing Rodriguez, but claimed he acted in self-defense. He had "no intention" when he knocked on Rodriguez's door; he just wanted to know what was going on. He did not intend to "have any trouble" with Rodriguez.

When Solorio answered the door, he asked for the "man of the house" who had accused his nephews of scratching his truck. Solorio told him Rodriguez had been causing trouble all afternoon. Solorio called to Rodriguez, who came to the door.

---

[3] According to a defense expert, Rodriguez's blood alcohol concentration at the time of the stabbing would have been .18 or .19 percent.

Rodriguez repeated that one of them scratched his truck. Appellant pointed out "some young guys" walking on the sidewalk with skateboards and said, "Just because he goes by close to that truck, doesn't mean that he scratched it." After that, "everything changed." Rodriguez put up his fists. Appellant backed away toward Peralta's truck because he thought Rodriguez would hit him.

When appellant got to the passenger door, Rodriguez tried to grab him. Appellant told Solorio that Rodriguez wouldn't let him leave, and she shrugged. When appellant turned back, Rodriguez was talking to the guys on the skateboard. Appellant rushed into the driver's side of the truck, and Rodriguez punched him in his face and tried to pull him through the window. Appellant testified that, at that point, he felt "scared," explaining, "I don't know the person. I wanted to speak, but that person didn't want to speak; that person wanted trouble."

Rodriguez then opened the truck door and pulled him out. Scared, appellant asked, "What's happening to you?" Rodriguez responded, "You're like a girl, whining. No matter what you do, you're not leaving here." Appellant wanted to run, but the open truck door blocked his escape. Appellant continued to feel "afraid," believing "[t]hat he wants to hurt me. I don't know him."

There was a knife in the cubby of the driver's door. Earlier, appellant had taken it out of Peralta's tool box as he helped Peralta repair his truck battery while he was parked at the liquor store. Appellant grabbed the knife, thinking it would scare Rodriguez. Instead, Rodriguez threw a punch with his left hand and grabbed the knife with his right hand. Appellant pushed him back with the knife, stabbing his hand. He then stabbed him

three times in his side, again testifying he did so because he was afraid. He stabbed Rodriguez in the back when he reached for the knife. Rodriguez then swung at him and he stabbed him twice in the neck. The stabbing occurred in eight seconds. Appellant was afraid if Rodriguez got the knife, Rodriguez would use it to kill him.

Appellant handed the truck keys to Peralta and said, "I'm screwed." He took off toward Peralta's apartment. On the way, he removed his blood-covered shirt and wrapped the knife in it. He did not call 911. That same night, he cut his hair because he was scared he would be recognized by Rodriguez's "friends or his brothers," assuming he had any brothers. The next morning, appellant left for Bakersfield for a job.

In a police interview, appellant said he didn't remember how many times he stabbed Rodriguez, claiming, "I lost my mind from that." He also claimed to have "passed out from the blow" and "lost consciousness" when Rodriguez hit him. On cross-examination at trial, he testified he did not actually pass out; he explained, "When I said 'consciousness,' I was talking about the reaction I had. That word is not being—that word is being misinterpreted." On redirect, he elaborated, "I wanted to say that I reacted, due to my fear. I had never reacted that way. Maybe I did it out of fear. I never had any argument with anybody. I never had a problem with anybody. It was new to me." He affirmed that he did not actually black out.

At trial, the prosecution argued for first-degree premeditated murder on the theory that the stabbing was planned. Appellant argued he acted in self-defense. The jury rejected the premeditation theory, but also rejected appellant's

self-defense theory. It convicted appellant of second-degree murder and found true a deadly weapon enhancement.

The court sentenced appellant to 15 years to life plus one year for the weapon enhancement.

## DISCUSSION

## I. The Trial Court Did Not Err by Instructing on Wrongful Conduct and Contrived Self-Defense

Appellant argues the trial court erred and violated his constitutional rights by giving CALCRIM No. 3472 and a portion of CALCRIM No. 571, both of which pertain to self-defense. We disagree.

CALCRIM No. 571 is the instruction on voluntary manslaughter via imperfect self-defense. Appellant attacks the following sentence included in the instruction: "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."

CALCRIM No. 3472 sets forth a related principle and states in full: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."

Appellant contends that, on this record, these instructions denied him the full protection of any self-defense because they "erroneously directed the jurors to conclude appellant had no right to self-defense against a deadly attack if he showed up at Rodriguez['s] house with bad intentions or grabbed a knife during their scuffle." He argues the error was exacerbated by the prosecutor's closing argument that, "You've got the defendant luring [Rodriguez] out there. Right? Now, he's now—after he's provoked a quarrel with this man, he's now trying to fall back on

7

self-defense to excuse his actions." In rebuttal, the prosecutor elaborated, "[T]his idea that you can introduce a weapon into this scenario and then say—then the guy tried to get it, so you create the dangerous situation. [¶] This is exactly in the—in the jury instructions for self-defense that I showed you. You create the dangerous situation, and then you say, 'The guy tried to grab it, and now I've got to kill him.' That's ridiculous. That's not self-defense. Follow the jury instructions. That's a crazy, crazy argument. That's not a legally permissible way of—of introducing self-defense into a scenario."

As we explain below, these instructions were correct on the law and relevant to this record. Hence, appellant forfeited his challenge to these instructions by failing to timely object to them or ask for clarification in the trial court. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "].)[4]

Even absent forfeiture, we find the instructions were appropriately given. "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime great than voluntary

---

[4] Appellant asserted his challenge to CALCRIM No. 571 in a new trial motion after the verdict. The court denied the motion. Appellant does not contend this constituted a sufficient contemporaneous objection to preserve the issue for appeal.

8

manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771 (*Christian S.*).)

Consistent with the portion of CALCRIM No. 571 appellant now finds objectionable, however, "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony) has created circumstances under which his adversary's attack or pursuit is legally justified. [Citation.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.) The California Supreme Court has repeatedly endorsed this principle. (See, e.g., *People v. Rangel* (2016) 62 Cal.4th 1192, 1226; *People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*); *People v. Valencia* (2008) 43 Cal.4th 268, 288.)

CALCRIM No. 3472 sets out the related principle of "contrived" self-defense—a defendant cannot invoke self-defense after provoking the confrontation to use force against the victim. It, too, has been endorsed in substance by our high court. (*Enraca, supra,* 53 Cal.4th at p. 761; see *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 [citing *Enraca* for the proposition that "CALCRIM No. 3472 is generally a correct statement of law."].)

Appellant's chief complaint appears to be, on this record, these instructions prevented the jury from concluding he acted in

self-defense if it believed he intended only to provoke a fistfight with Rodriguez, and Rodriguez responded to his provocation by using *deadly* force. In appellant's view, had the jury accepted that version of the evidence and had it been properly instructed, it could have concluded appellant responded in either reasonable or unreasonable self-defense by stabbing Rodriguez to death. He is wrong.

Appellant doesn't discuss *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) in his opening brief, but the court in that case accepted the same argument appellant has presented here that "the trial court's instruction on contrived self-defense erroneously directed the jury to conclude a person has *no* right to self-defense against an adversary's deadly attack, even if the defendant contrived to provoke a confrontation to use only nondeadly force against the adversary." (*Id.* at p. 945.) The defendant and others in that case had confronted a group of rival gang members "aggressively," and a fistfight broke out. The defendant testified he thought he saw one of the rivals holding a gun, so he shot and killed him. At trial, the defendant claimed self-defense and defense of his companions. (*Id.* at pp. 944–945.)

The trial court instructed the jury with CALCRIM No. 3472, which the Court of Appeal held was erroneous. The Court of Appeal reasoned that the instruction did not accurately state the law under the facts because the instruction, and the prosecutor's argument on the instruction, effectively told the jury, " 'A person does not have [*any*] right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [*any*] force.' In effect, the prosecutor and the trial court advised the jury that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force. The adversary

simply may stab or shoot a person who contrives what he thought would be a shoving match or fisticuffs. According to the prosecutor and the trial court's instruction: 'A person does not have the right to self-defense' in those circumstances." (*Id.* at p. 947.)

The *Ramirez* court conceded CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances. Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. [Citation.] And when a defendant contrives a 'deadly' assault [citation], there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures." (*Ramirez, supra,* 233 Cal.App.4th at p. 947.)

The court discussed *Enraca* as an example of the proper use of CALCRIM No. 3472. *Enraca* involved a defendant who "shot two victims at close range in the back of the head, execution-style. The defendant's version of events established the victims were entitled to use deadly force to meet his deadly actions, and therefore the trial court did not err in instructing the jury with CALCRIM No. 3472's antecedent that a defendant who contrives to use force may not claim self-defense. Specifically, the defendant told investigators the first victim (Hernandez) slapped at the defendant's gun when the defendant pulled Hernandez's head back, and the defendant shot Hernandez because he thought Hernandez was reaching for a gun in the victim's possession. Having shot Hernandez, the defendant also shot the other victim (Gobert) because he believed Gobert was reaching

11

for the same (nonexistent) gun as Hernandez.  As the Supreme Court explained, there was nothing unreasonable or unpredictable in the victims' supposed responses:  'Hernandez responded to being pulled up by the hair by an armed assailant, and Gobert acted in resistance to Hernandez being killed.' (*Enraca, supra,* 53 Cal.4th at p. 760.)  Thus, there was no possible error in the trial court's instruction on contrived self-defense.  Simply put, a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force.  The evidence justified the contrived self-defense instruction there.  (*Id.* at pp. 761–762.)"  (*Ramirez, supra,* 233 Cal.App.4th at pp. 947–948.)

The facts here are governed by *Enraca* and fall far afield of *Ramirez*.  Assuming appellant's version of the stabbing is correct, appellant was the one who grabbed the knife and escalated what started out as a nondeadly fistfight, provoking Rodriguez into grabbing for the knife to defend himself.  True, if the jury believed appellant's testimony, Rodriguez was the initial aggressor.  After appellant innocently knocked on Rodriguez's door to ask about the scratching of the truck, Rodriguez responded by putting up his fists as appellant backed away toward Peralta's truck.  At the truck, Rodriguez got physical—he tried to grab appellant, then punched him through the truck window and tried to pull him out.  At that point, appellant grabbed the knife.  Rodriguez threw a punch with his left hand and grabbed the knife with his right.  Appellant pushed him back with the knife, stabbing his hand, then stabbed him three times in his side and once in the back when Rodriguez reached for the

12

knife. Rodriguez then swung at appellant, and appellant stabbed him twice in the neck.

If appellant is to be believed, at no point prior to appellant grabbing the knife did Rodriguez use *deadly* force against appellant. He started a fistfight. He was unarmed, they were similarly sized (both were 5'4" tall), and neither one of them bore any injuries typical of a mutual fistfight, suggesting it had not escalated into any kind of deadly force scenario. Rather, it was appellant who escalated the confrontation from a nondeadly confrontation into a deadly one by grabbing the knife and using it against Rodriguez. That he feared Rodriguez would grab the knife from him and use it is exactly the type of contrived scenario falling within CALCRIM No. 3472 and CALCRIM No. 571. In other words, appellant created the deadly scenario requiring Rodriguez to lawfully fight back. Whether or not Rodriguez instigated the fistfight, appellant escalated the situation to one in which Rodriguez was "justified in meeting deadly force with deadly force." (*Ramirez, supra,* 233 Cal.App.4th at p. 948.) Both CALCRIM No. 3472 and CALCRIM No. 572 were proper as given.

Appellant relies on *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*), but it has no application here. The trial court in that case refused to give *any* instruction on imperfect self-defense, which this Division held was erroneous under the facts. We rejected the trial court's conclusion that the defendant was not entitled to imperfect self-defense because he had created the need to defend himself by luring the victim into the confrontation. (*Id.* at p. 1179.) We said the trial court "interpreted imperfect self-defense too narrowly . . . . Imperfect self-defense does not apply if a defendant's conduct creates

13

circumstances where the victim is *legally* justified in resorting to self-defense against the defendant. [Citation.] But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Id.* at pp. 1179–1180.) Under the facts of the case, the defendant was "up to no good" and "generally set in motion the circumstances that led [the] victim[] to attack [him]," but the evidence suggested the victim, not the defendant, "used unlawful force first. Accordingly, appellant was entitled to assert imperfect self-defense." (*Id.* at p. 1180.)

Unlike in *Vasquez*, the jury here was fully instructed on perfect and imperfect self-defense, so the jury was free to conclude appellant acted in self-defense, that is, he actually and either reasonably or unreasonably believed he needed to defend himself with deadly force. Also unlike in *Vasquez*, Rodriguez did not use *unlawful* force in fending off appellant's knife attack. Again, Rodriguez might have used unlawful, nondeadly force when he initiated the fistfight. But when appellant used deadly force by attacking Rodriguez with the knife, Rodriguez was legally justified in responding with deadly force by attempting to grab the knife and fend off appellant. No additional clarification in the instructions was necessary.

## II.    Heat-of-Passion Instruction Was Not Warranted

As noted, the court instructed the jury on perfect self-defense and voluntary manslaughter via imperfect self-defense. Appellant contends the trial court erred and violated his constitutional rights by not *also* instructing the jury on voluntary manslaughter via heat of passion. Appellant did not request an instruction on heat of passion but argued in his new trial motion

14

that the trial court erred in not giving one.  In denying the motion, the trial court found the evidence was insufficient to support giving a heat-of-passion voluntary manslaughter instruction.  We agree.

" 'Murder is the unlawful killing of a human being with malice aforethought.  (See § 187, subd. (a).)  A murder, however, may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation or reflection' [Citation.]  [¶]  Heat of passion has both objective and subjective components.  Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citation.] . . .  [¶]  Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.  [Citation.]  "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" [Citation.]' " (*Enraca, supra,* 53 Cal.4th at p. 759.)  " 'No specific type of provocation is required, and "the passion aroused need not be anger or rage, but can be any ' " "[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge." ' " (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.)

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's

15

understanding of the case." (*Enraca, supra,* 53 Cal.4th at p. 759.) Voluntary manslaughter is a lesser included offense to murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) In a homicide case, the trial court has a sua sponte duty to instruct on each theory of voluntary manslaughter supported by substantial evidence, including voluntary manslaughter due to sudden quarrel or heat of passion. (*Id.* at p. 162; *People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) Substantial evidence in this context is evidence " ' "from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." [Citations.]' [Citation.]" (*Enraca, supra,* at p. 759.) It does not mean " ' "*any* evidence, no matter how weak," ' " but rather, " ' " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*).)

Evidence of the subjective element was missing in this case. *Moye* is on point. The defendant in that case was convicted of second-degree murder for bludgeoning his victim to death with a baseball bat. The trial court instructed on voluntary manslaughter via imperfect self-defense but refused to instruct on voluntary manslaughter via sudden quarrel/heat of passion, finding insufficient evidence supported that theory. (*Moye, supra,* 47 Cal.4th at p. 548.) The California Supreme Court agreed.

The record showed the night before the murder, the defendant and his co-defendants got into an argument and fistfight with the victim, the victim's brother, and their friends. (*Moye, supra,* 47 Cal.4th at p. 542.) The next morning, the defendant and his co-defendants encountered the victim and his

16

friend. The defendant said, " 'Come on, let's go, let's get these motherfuckers.' " They chased the victim and his friend, and the defendant beat the victim to death with a baseball bat the victim had dropped. The defendant and his companions drove away, discarding the baseball bat as they fled. (*Id.* at p. 544.)

The defense at trial consisted primarily of the defendant's testimony. He admitted the killing but claimed just prior to the murder he mistook the victim for the victim's brother. He only drove up to the victim and his friend "in order to talk, try to resolve things, and avoid a continuing conflict." (*Moye, supra,* 47 Cal.4th at p. 545.) He claimed the victim kicked his car, which made him " 'kind of upset,' " but he pursued the victim "intending 'to see where he [the victim] went.' " (*Id.* at p. 545.) When the defendant caught up with the victim, the victim attacked him with the bat, hitting him several times. The defendant then grabbed the bat, and the victim tried to " 'rush' " him. The defendant hit him once, but he still came at the defendant, and the defendant hit him again each time. The defendant described himself as not " 'in the right state of mind' " because he was " 'worried about getting hit.' " (*Id.* at p. 546.) He " 'got kind of scared' " when he saw the victim bleeding, so they drove off. He was " 'kind of shook up about everything that happened.' " (*Id.* at p. 547.)

On this record, our high court held "no reasonable jury could conclude defendant acted ' " 'rashly or without due deliberation and reflection, and from this passion rather than from judgment . . . ' " [citations]' [citation] when, according to defendant, he responded to [the victim's] attack with the baseball bat by grabbing the bat from him and using it to defend himself from [the victim's] continuing advances." (*Id.* at p. 553.) Rather,

17

the defendant's testimony demonstrated he approached the victim with peaceful intentions, and he "took great pains in his testimony to justify each blow he landed on [the victim] with the bat as a direct, defensive response to successive advances by [the victim] during his attack on defendant." (*Moye, supra,* 47 Cal.4th at p. 554.)

"In short, the thrust of defendant's testimony below was self-defense—both reasonable self-defense . . . , and unreasonable or imperfect self-defense . . . . There was insubstantial evidence at the close of the evidentiary phase to establish the defendant 'actually, subjectively, kill[ed] under the heat of passion.' [Citations.] The only testimonial evidence on the point, substantial or otherwise, came from defendant himself given his decision to take the stand and testify in his own defense. His only claim was that he acted out of self-defense in using the bat to thwart [the victim's] continuing advances. He provided a blow-by-blow recounting of events in which he characterized every swing he took with the bat as a defensive response to each of [the victim's] successive advances." (*Moye, supra,* 47 Cal.4th at p. 554.)

The facts here are substantively indistinguishable from *Moye.* As in *Moye*, this was a self-defense case. The only testifying witness to the entire stabbing incident was appellant, and the only evidence of his state of mind at the time of Rodriguez's attack was his own testimony. No evidence suggested they knew each other or had any history of animosity or confrontations. Unlike in *Moye*, appellant wasn't present when Rodriguez confronted Peralta and the others at the liquor store prior to the stabbing. As in *Moye*, however, appellant went to Rodriguez's door with "no intention" other than to find out

what had happened with the truck. He went so far as to politely ask Solorio for the "man of the house."

Appellant and Rodriguez were roughly the same height— 5'4". When Rodriguez became combative, he was unarmed, drunk, and high. He advanced on appellant with his fists up, and appellant backed toward Peralta's truck. When Rodriguez punched him, and tried to drag him through the truck window, appellant grabbed the knife. At trial, appellant provided a move-by-move recounting of the stabbing, describing each of his knife thrusts and each of Rodriguez's defensive moves. According to appellant, the attack lasted only eight seconds, and yet it left Rodriguez with six stab wounds, including two to the back.

Appellant testified he was scared during the confrontation. The defendant in *Moye* similarly testified he was not " 'in the right state of mind' " because he was " 'worried about getting hit.' " (*Moye, supra,* 47 Cal.4th at p. 546.) Yet, as in *Moye*, nothing in this record demonstrated appellant's fear obscured his deliberation or reflection. True, in his police interview, appellant claimed he had "lost [his] mind" and passed out from Rodriguez's punches. Yet, at trial he clarified he did not actually lose consciousness, but reacted due to his fear. Appellant's fleeting and confused comment during his interview was exceedingly weak evidence and did not overcome his clear and detailed trial testimony about the fight and his state of mind at the time.

To paraphrase *Moye*, appellant "provided a blow-by-blow recounting of the events in which he characterized every [stab] as a defensive response to each of [Rodriguez's] successive advances." (*Moye, supra,* 47 Cal.4th at p. 554.) Someone able to recall and recount each move in an eight-second-long fight as he stabbed his adversary six times hardly acted " ' " 'rashly and

without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" [Citation.]' " (*Enraca, supra,* 47 Cal.4th at p. 759.)  This record contained "insubstantial evidence . . . to establish that [appellant] 'actually, subjectively, kill[ed] under the heat of passion.' " (*Moye, supra,* at p. 554.) No heat-of-passion voluntary manslaughter instruction was warranted.

In any case, any failure to instruct on heat of passion voluntary manslaughter was harmless under either state or federal standards.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 [more favorable outcome reasonably probable]; *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt].)  Again, *Moye* is on point.[5]  The court in that case found no prejudice from the failure to instruct on heat-of-passion manslaughter because "it is reasonable to assume the jury considered all of the defense evidence bearing on defendant's state of mind and the question whether he harbored malice when it entertained *and rejected* his claims of reasonable and unreasonable (or imperfect) self-defense." (*Moye, supra,* 47 Cal.4th at p. 556.)  "Once the jury rejected defendant's claims of

---

[5]     *Moye* applied only the *Watson* standard for harmless error, whereas appellant here claims the instructional error amounted to a constitutional violation.  (See *Moye, supra,* 47 Cal.4th at p. 556.)  Some courts have held *Chapman* applies when the defendant raises a constitutional challenge to the failure to instruct on a heat of passion theory.  (See *People v. Thomas, supra,* 218 Cal.App.4th at p. 644 ["Failure to instruct the jury on heat of passion to negate malice is federal constitutional error requiring analysis for prejudice under *Chapman.*"].)  We will assume *Chapman* applies to this claim, because even under this stricter standard, we find no prejudice.

20

reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*Id*. at p. 557.)

Likewise here, the jury rejected appellant's version of the stabbing as motivated by self-defense. Appellant's theory of heat-of-passion voluntary manslaughter would have rested on the same version of events, and having rejected it for self-defense purposes, the jury almost certainly would not have accepted it as the basis for voluntary manslaughter based on a heat-of-passion/sudden quarrel theory.

Further, the evidence supporting second-degree murder was overwhelming. Appellant stabbed Rodriguez six times, including twice in the back, even though Rodriguez was unarmed. Four of the wounds were fatal. Immediately after the attack, appellant had enough wits about him to hand the truck keys to Peralta and realize, "I'm screwed." Then he fled. He admitted he took steps to cover up his participation in the stabbing—he quickly removed his blood-covered shirt and wrapped the knife in it; he did not call 911; he cut his hair the same night; and he fled to Bakersfield the next morning. These are not the actions of a man acting rashly and without deliberation because he had just been violently attacked by an adversary.

Also, after rejecting the factual basis for any sort of self-defense theory, the jury would not have found the objective component of heat of passion voluntary manslaughter met.

21

In fact, the jury was instructed with CALCRIM No. 522, which told the jury it could consider provocation in deciding the degree of murder or whether the killing was murder or manslaughter. In convicting appellant of second-degree murder, the jury necessarily considered and rejected the possibility that any provocation was sufficient to reduce murder to manslaughter. (See *Moye, supra,* 47 Cal.4th at p. 557 ["Moreover, the jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter."].) Any instructional error was harmless under either state or federal standards.

## III.  Errors in the Abstract of Judgment Must Be Corrected

Appellant identifies, and respondent concedes, two errors in the abstract of judgment. First, the abstract of judgment incorrectly identifies appellant's prison term as "16 years to Life on counts 01." The correct term for second-degree murder is 15 years to life, plus one year for the deadly weapon enhancement, as pronounced by the trial court. The abstract of judgment must be amended to clarify the correct sentence.

Second, the abstract of judgment incorrectly identifies a criminal conviction fee of $60. At the sentencing hearing, the court correctly imposed $30 for the single count of conviction. The abstract of judgment must be amended to reflect the proper amount.

## DISPOSITION

The trial court is directed to issue an amended abstract of judgment that identifies appellant's prison term as 15 years to life plus one year for the weapon enhancement and identifies a criminal conviction fee of $30.  The court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


BIGELOW, P. J.

We Concur:


GRIMES, J.


WILEY, J.