Filed 4/29/25  P. v. Rodriguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082367 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS321162) |
| JESUS MANUEL RODRIGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy R. Walsh, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jesus Manuel Rodriguez of the first degree murder of S.D. (Pen. Code,[1] § 187, subd. (a)). It found true allegations that Rodriguez personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and that he personally used a firearm during the murder's commission (§ 12022.5, subd. (a)). The court sentenced him to 25 years to life for the murder conviction plus 25 years to life for the personal-discharge enhancement. It stayed under section 654 the four-year term for the section 12022.5, subdivision (a) personal firearm use enhancement.

Rodriguez contends the court violated his confrontation rights when it admitted conditional examination testimony of a critical witness to the events leading up to and during the victim's shooting, as the prosecution did not show the witness was unavailable. He further contends the court erred when it instructed the jury with CALCRIM No. 3475, which unfairly labelled him a trespasser and negated his claim of self-defense. Rodriguez finally raises various errors with respect to the court's imposition of the section 12022.53, subdivision (d) firearm enhancement. We reject the contentions, and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*People's Evidence*

In January 2022, S.D.[2] lived in an apartment's converted garage in Imperial Beach. He was in a dating relationship with the defendant's ex-wife, N.R., who lived in the same complex. Rodriguez was not happy about

---

[1]   Undesignated statutory references are to the Penal Code.

[2]   Both witnesses N.R. and L.M. testified that S.D. has a family member, S.D.C. with the same name but with an additional surname. Hence, we refer to the victim as S.D. and his family member as S.D.C.

N.R.'s relationship with S.D.  After their divorce, he and N.R. continued to be intimate and saw each other frequently to co-parent their children.

On January 29, 2022, N.R. and Rodriguez went to a bar they frequented; she was planning to move with S.D. to Arizona but had only told Rodriguez she was going away for a month or so to focus on herself.  They were having a good time until Rodriguez made physical advances at N.R., which she rebuffed, frustrating and upsetting him.  Rodriguez, who toward the end of the night was very intoxicated, began denigrating S.D.  N.R. told him she did not care what he said, prompting Rodriguez to quickly leave the bar.

At about midnight Rodriguez and N.R. got into Rodriguez's car, which he drove extremely fast to N.R.'s apartment complex.  Rodriguez drove up to S.D.'s garage, exited the car and began walking toward the garage, where he ran into S.D.'s friend, L.M., and pointed a gun at his face  Rodriguez then said he had the "wrong guy," and ran away.  L.M. ran the other way and saw N.R., who told him to help S.D. because Rodriguez had a gun.  L.M. grabbed a golf club to protect himself then heard shots and ran into S.D., who told L.M. that Rodriguez had "blanks" in the gun.  N.R. saw Rodriguez walk out of S.D.'s garage and yelled at him to leave.  Rodriguez and S.D. proceeded to have an angry and combative argument.  Eventually Rodriguez reentered his car and drove off after L.M. ran up and hit at the driver's side window.  After Rodriguez left, S.D. showed L.M. that there were bullet holes in a speaker in his garage.

Just before 3:00 a.m., Rodriguez drove back to the area of the apartment complex.  He parked and walked down the alley toward S.D.'s garage.  Rodriguez and S.D. then had an exchange in which Rodriguez said, "Stop or I'm gonna kill you," and told S.D. to "[p]ut your hands up, homie."

N.R., who had been resting on a bed in the garage, initially stayed behind a curtain. After she heard a struggle, she opened the curtain to see S.D. face to face with Rodriguez and pinning him to a vehicle. Rodriguez had a gun in his right hand and S.D. was holding Rodriguez's arm up in the air. N.R. saw that S.D. was trying to stop Rodriguez from using the gun. N.R. went to them and tried to reach for the gun, but the men told her to leave. She walked away and sat on the stairs to her apartment holding her ears, then heard a gunshot and saw Rodriguez run past. N.R. ran to S.D., who was bleeding, then called 911. Rodriguez fled the scene.

S.D. died from a gunshot wound to his chest. He had two other gunshot wounds through his right upper arm and the palm of his right hand.

*Security Video Evidence and 911 Call*

Detectives obtained security camera video from surrounding homes, which was played for the jury. One video showed Rodriguez and N.R. arrive at S.D.'s garage at about 12:34 a.m., and Rodriguez leave the vehicle with something in his right hand. The video recorded sounds of the argument between Rodriguez and S.D. and one gunshot; it then captured Rodriguez returning to his car and moving it forward while L.M. approached and hit the car.

Another camera recorded events at approximately 2:56 a.m. near the alley toward S.D.'s residence. That video showed Rodriguez walking toward the apartment complex driveway and garage area, then about three minutes later running away after the shooting in the alley. Another video captured N.R. and Rodriguez moving back and forth around S.D.'s garage before and after the gunshots, and N.R. running back to S.D. while Rodriguez left the scene. A transcript from the security video showed that Rodriguez told N.R. to get in his car, while she told him, "No, . . . stop!" After she screamed,

4

Rodriguez said, "Shit" and again told N.R. to get in his car. N.R. called out to S.D. and ran to him, telling him to "please don't die!"

The People also played N.R.'s call to 911 after the shooting.

*Defense Evidence*

Rodriguez testified he acted in self-defense. He explained that he had seen N.R. with black eyes, lacerated lips and bruises all over her, and offered to help her. That night, N.R. had said things that indicated to him she did not want to see S.D. anymore, so at the end of the night Rodriguez told her he was going to talk to S.D. and tell him to leave N.R alone. When he reached the apartment complex, he grabbed his gun, which had a clip with blank rounds, so S.D. would know he "wasn't playing around." Rodriguez walked into the garage and told S.D. to leave N.R. alone, that she was done using methamphetamine.[3] The first time he shot his gun was because S.D. had removed his hands from his pockets and "came at [him]" and Rodriguez knew S.D. had guns. Rodriguez did not intend to shoot S.D. Rodriguez told S.D. he would be back.

When Rodriguez returned later that morning, he loaded his gun with real bullets to protect himself because he knew S.D. was a gang member who carried a gun. Rodriguez intended to fight S.D., not shoot or kill him. According to Rodriguez, the gun ended up firing during a physical fight with S.D., when S.D. had grabbed the gun, and while Rodriguez was pulling it out of S.D.'s hand. The gun went off again after Rodriguez fell when his arm hit the ground. He fired the gun two more times when he saw S.D. come at him again, and Rodriguez assumed he was trying to grab the gun again. After Rodriguez learned S.D. had died, he fled to Mexico but turned himself in a

---

[3]    N.R. testified at her conditional examination that at the time of his death, S.D. was her methamphetamine supplier.

5

few months later because he knew he had no intention of shooting or killing S.D. that night.

## DISCUSSION

### I. *Admission of N.R's Conditional Examination*

A. *Background*

Before trial, the court granted the People's request that N.R undergo a videotaped conditional examination after she was hospitalized for a drug overdose.[4] The examination took place in January 2023, with defense counsel conducting a full cross-examination. Trial was set for April 25, 2023.

During preliminary discussions on April 25, 2023, the prosecutor advised the court that they had been in contact with N.R. the previous Friday, but she did not appear in the courtroom when ordered, so the People had a bench warrant for her appearance. The prosecutor told the court they would be attempting to locate her but if she was unavailable they might ask to admit her conditional testimony. Rodriguez's counsel acknowledged that the People had ordered N.R. to appear, and that he had also subpoenaed her to come to court that day.

Two days later, during jury selection, the People moved to admit N.R.'s conditional examination. The prosecutor reported that they still had not had contact with her and expected she would not appear for trial. The People's motion indicated that N.R. had acknowledged receiving a trial subpoena on March 24, 2023. Thereafter, a district attorney investigator made several unsuccessful attempts to contact her, but eventually spoke with N.R. on April 20, 2023, when he confirmed she would be present on her court date. N.R. did not appear for a scheduled trial preparation meeting the next day, and

---

[4] N.R. testified at her conditional examination that she had overdosed on Fentanyl "about 20" times and still sometimes used methamphetamine.

the investigator called her last location and was told she had left. On April 24, 2023, the investigator looked for N.R. at a transient encampment and when she did not appear at trial he made several phone calls to her that went to voicemail. The People obtained the bench warrant. The investigator searched other transient camps, parks, motels and other areas N.R. was known to frequent, her mother's home and the point of entry border crossing. He confirmed N.R. was not currently in custody. The prosecutor advised the court that as of that morning, two investigators were out looking for N.R.

The court asked the prosecution to provide an updated report, noting there were three and a half days before it had to make its finding of N.R.'s unavailability. The prosecutor pointed out that N.R. had visited Rodriguez, expressed reservations about testifying, and afterwards stopped responding to their calls. He offered that she was likely actively avoiding the subpoena. The court indicated its tentative view was to find unavailability and admit the video, as long as it found the People had continued its efforts during the coming days to use its law enforcement resources to locate her.

At the next hearing on May 1, 2023, the prosecutor advised the court that the investigator had notified all law enforcement agencies and resources available to locate individuals, and there were no new updates. As of that morning, the investigator had not received any notification from those law enforcement contacts. He also tried calling N.R.'s phone number and received an automated message, and spoke to N.R.'s mother, who had also

7

tried calling N.R. several times without luck.  N.R.'s mother last had contact with N.R. briefly after she missed her pretrial preparation meeting.[5]

Indicating it had read and considered the investigator's report, the court granted the People's request to present N.R.'s conditional examination. In doing so, it stated:  "My initial reaction to [the prosecutor's update of efforts to locate N.R.] was why weren't the investigators out in town driving around looking for her?  But the reality is, okay.  It's a big town.  It's a big city.  And unless there's some reason to go to a specific location beyond what they've already gone to, I've been given no indication that she hangs out at a specific spot.  It's clear to me that she's avoiding this.  She's not available. She doesn't want to be here.  And as such, I'm making a finding of her unavailability pursuant to Evidence Code section 240[, subdivision] (a)(5)." The court found "even beyond the dates listed [in the investigator's report, the People] exercised due diligence to find this person.  She's not available. Under [Penal Code section] 1345 prior sworn testimony that was noticed

---

[5]     This court granted Rodriguez's requests to augment the record with N.R.'s conditional hearing transcript as well as a sealed May 1, 2023 in camera hearing transcript.  We granted his request that the latter transcript be provided to his counsel only.  Rodriguez has asked that we unseal the portion of the May 1, 2023 transcript in which the court held a brief in camera discussion with counsel and make it part of the appellate record.  He argues the court ordered sealing without a "specific reason."  He states "the hearing was likely held in camera to allow defense counsel not to divulge trial strategy" and asserts that since the trial is over "that reason for sealing no longer applies."  Rodriguez further states that "leaving the items sealed without justification" would lead to undue time and expense, as it would require the parties to file both redacted and sealed versions of their briefs. None of the briefs filed in this appeal have redactions, and Rodriguez's assertion concerning his counsel's trial strategy appears to be speculation. Since his appellate counsel had access to the sealed portion of the transcript, we are not persuaded that unsealing is warranted.

testimony—and . . . it was prepared specifically as a conditional exam in the event this happened.  It will be allowed."

The day after the court's ruling, the People filed a supplemental paper attaching an investigation report listing 26 locations where N.R. had been contacted or located by family members in the past that the investigator had searched on April 28, 29, and 30, 2023.  The court reaffirmed its ruling that the People had exercised due diligence in locating her.  It then allowed the People to play the conditional examination video for the jury.

The People rested their case five days later on May 8, 2023.  The next day, N.R. appeared in the courtroom.  The court had her placed in a nearby courtroom and advised the parties it would continue the trial.  Defense counsel moved for a mistrial, which the court denied, finding no wrongful conduct or prejudice.  Defense counsel proceeded with Rodriguez's testimony. Following a break, the court revisited the issue of N.R.'s appearance and how to proceed on her arrest warrant.  Defense counsel advised the court, "I'm not going to call her.  She's testified."  After recounting the circumstances of N.R.'s subpoena and her failure to appear, the court remanded N.R. into custody, and the matter proceeded with defense counsel resting his case without calling her as a witness.

B.  *Legal Principles*

We recently summarized the relevant legal principles in *People v. Ayala* (2024) 101 Cal.App.5th 62, explaining that a defendant has a constitutional right to confront prosecution witnesses, but that right is not absolute.  (*Id.* at p. 68.)  " 'An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination.' "  (*Ibid.*)  This exception permits the court to

admit the prior sworn testimony of the unavailable witness at trial without violating the defendant's confrontation right. (*Ibid.*)

"A witness is unavailable when the witness is absent from the hearing and the proponent of the witness's testimony has exercised reasonable diligence but has been unable to procure the witness's attendance by the court's process." (*People v. Ayala*, *supra*, 101 Cal.App.5th at p. 69.) The prosecution must demonstrate that " 'the witness is unavailable and, additionally, that it made a "good-faith effort" [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial.' [Citation.] While due diligence lacks a precise definition, . . . it ' " 'connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.' " ' " (*People v. Wilson* (2021) 11 Cal.5th 259, 291; see also *People v. Cogswell* (2010) 48 Cal.4th 467, 477.)

As the proponent of the evidence, it is the People's burden to show a witness is unavailable (*People v. Wilson*, *supra*, 11 Cal.5th at p. 291; *People v. Smith* (2003) 30 Cal.4th 581, 609) and "that it made a 'good-faith effort' . . . or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440.) To determine whether the prosecutor has shown reasonable diligence we look to factors "includ[ing] the timeliness of the search, the importance of the witness's testimony, and whether leads to the witness's possible location were reasonably explored. [Citation.] The timely commencement of the search and the energy with which it was pursued are sequential aspects of the prosecution's obligation to demonstrate diligence. But whether these efforts were reasonable depends in part on the importance of the witness's testimony. If a witness is critical, the search must be started sooner and pursued with more energy than if the witness is less significant. And while

10

we defer to the trial court's determination ' "of the historical facts of what the prosecution did to locate an absent witness" ' [citation], we independently review the prosecution's claim of good faith and reasonable diligence." (*People v. Ayala, supra,* 101 Cal.App.5th at p. 69; see also *People v. Wilson, supra,* 11 Cal.5th at p. 293; *Sánchez,* at p. 442; *People v. Cromer* (2001) 24 Cal.4th 889, 893, 901.)

Applying these standards, we determined in *People v. Ayala* that the prosecution did not exercise reasonable diligence when searching for a witness who heard the screams of the victim dying, saw the defendants carry the victim's body out of a recreational vehicle, and helped clean up blood and other debris after the killing. (*People v. Ayala, supra,* 101 Cal.App.5th at p. 66.) The witness identified for investigators the perpetrators involved in the murder and participated in a walk-through of the crime scene. (*Id.* at p. 70.) That witness appeared and testified at a preliminary hearing in late 2017, but the district attorney's office lost contact with her sometime before the COVID-19 pandemic. (*Ibid.*) After several continuances, trial was set for April 2020, but nothing in the record showed the prosecution did anything to locate the witness before the trial date, even though the prosecution "was also aware that the matter would eventually be rescheduled for trial, and that [the witness] was missing." (*Ibid.*) Even after "numerous additional continuances" to July 2021, "it was not until July 6, seven days [before the parties declared they were ready for trial], that [the district attorney investigator] first created a subpoena for [the witness] and the search for the missing witness began." (*Ibid.*) The investigator was able to "quickly" learn where the witness's child lived and visited the location, learning the witness had been there earlier. (*Ibid.*) "Critically, had the prosecution attempted to locate [the witness] a few weeks or even days earlier it would have discovered

11

where her child lived, that [the witness] visited her child every month or two, and likely could have contacted her well before the eventual trial date." (*Ibid*.)

In *Ayala,* we observed that while the witness lived a transient lifestyle, she cooperated with police before the preliminary hearing by telephoning the investigator when she learned law enforcement was looking for her, meeting with him and identifying photographs of the persons involved in the murder, and participating in a walk-through of the crime scene, pointing out where the victim's body had been burned. (*People v. Ayala*, *supra*, 101 Cal.App.5th at p. 70.) She underwent a second interview with the investigator, then appeared at the preliminary hearing. (*Ibid*.) We noted there was "nothing in the record to suggest that [the witness] disappeared to avoid testifying, would have been uncooperative if located or even knew the prosecution was looking for her." (*Ibid*.)

Under those circumstances, we held that while the prosecution exercised diligence during the two weeks it searched for the witness immediately before trial, its search was untimely, as "it did nothing to locate her during the months this matter was repeatedly continued for trial . . . ." (*People v. Ayala*, *supra*, 101 Cal.App.5th at pp. 70-71.) We stated: "The uncertainty as to when trial would begin does not excuse the prosecution from timely starting to search for a cooperative witness it actually knew was missing. The record suggests [the witness] would have been found and produced had the prosecution begun to look for her even a short time earlier." (*Id*. at p. 71.) Further, the witness's testimony was "essential to the prosecution's case" as she was the only witness who knew the victim and had percipient knowledge of the events leading up to the murder, including the motive of the alleged perpetrator, who told a materially different story.

(*Ibid.*)  The witness's story was critical to establish the degree of murder, the lying in wait special circumstance allegation as to both defendants, and for corroboration of another witness's testimony regarding the torture special circumstance allegations.  (*Ibid.*)  Thus, we held the witness was not unavailable, and the court erred by admitting her preliminary hearing testimony.  (*Ibid.*)

*People v. Ayala, supra,* 101 Cal.App.5th 62 found parallels to the circumstances in *People v. Cromer*, *supra*, 24 Cal.4th 889, in which the California Supreme Court reached a similar conclusion.  There, the prosecution had learned of a witness's disappearance two weeks after the June 1997 preliminary hearing, but took no action on that information.  (*Cromer*, at p. 903.)  The trial was originally slated to begin in September 1997, but was delayed until January 1998.  (*Ibid.*)  The prosecution, however, took no action to find the witness until six months had passed, in December 1997.  (*Ibid.*)  After the case was called for trial, the prosecution obtained information that she was living with her mother, but the investigators waited two days to follow up on it, and only then they merely left a subpoena at the witness's mother's home without returning or attempting to find contact information so they could speak with her mother.  (*Id.* at pp. 903-904.)  *Cromer* observed any serious efforts to locate the witness were "unreasonably delayed" and the investigation of promising information "unreasonably curtailed," leading to the conclusion that the prosecution failed to exercise reasonable diligence to secure her attendance at trial.  (*Id.* at p. 905.)

More recently, the high court in *People v. Wilson, supra,* 11 Cal.5th 259 reached the opposite conclusion on a defendant's challenge to the availability of a witness who saw perpetrators to a multiple murder leave the scene of the crimes: a car wash where the witness worked.  (*Id.* at pp. 270-271.)  The

defendant challenged the court's admission of the witness's preliminary hearing testimony at trial, arguing the witness was not unavailable so it violated his confrontation rights. (*Id*. at pp. 287-288.)

The court rejected the contention: "The prosecution initially had no reason to suspect [the witness] would be . . . reluctant or unavailable . . . he willingly participated in identification and preliminary hearing proceedings in June 1998. It was not until March 1999 that the prosecution understood [the witness] was apprehensive, and not until May 1999 that serious concerns began to arise about his participation in proceedings. On May 20, 1999, [the witness] was subpoenaed to appear at trial, but failed to do so. [A detective] tried to contact [the witness] . . . where [he] worked, but failed in his efforts. [The witness and the detective] spoke several times by telephone in May and June 1999, and although [the witness] promised he would meet with [the detective], those meetings did not occur. During these calls, [the witness] consistently refused to reveal his address or permanent phone number. [The detective] visited [the witness's] last known address three times, but a neighbor told [him] that [the witness] had not been seen there for about two months, and [the witness's] ex-girlfriend confirmed he had moved away to an unknown location after the shootings due to fear of testifying. [The witness's] ex-girlfriend had received collect calls from people looking for [him]. [¶] [The detective] visited [the witness's workplace] a few more times in June 1999—once after [the witness] told him the two could meet there—but [the witness] was never there. [The detective] visited another location where [the witness] was said to frequent, but he did not see [the witness] there. In mid-June 1999, after [the witness] failed to make it to a scheduled meeting with [the detective] at the police station, [the detective]

14

confirmed [the witness] was not in custody. These many efforts undertaken by [the detective] on behalf of the prosecution are the very definition of ' " 'persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.' " ' " (*People v. Wilson*, *supra*, 11 Cal.5th at pp. 291-292.)

The *Wilson* court contrasted cases in which courts found deficiencies— "cases where review did not reveal 'adequate diligence, [and where] the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent.' " (*People v. Wilson*, *supra*, 11 Cal.5th at p. 292.) It stated: "In contrast, 'diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period.' [Citation.] [The detective's] efforts to secure [the witness's] testimony once it became clear he would no longer cooperate spanned a month and included pursuit of multiple avenues of inquiry. The efforts were far from perfunctory or negligent. Simply because Wilson suggests [the detective] could have taken different steps does not mean those he did take lacked diligence." (*Id.* at p. 293.) Further, the court found the witness's testimony, while helpful to the prosecution's case because he saw his murdered coworker's vehicle being hastily driven away, was not critical because he could not positively identify the defendant. (*Ibid.*) The court held the prosecution was reasonably diligent in its efforts to secure the witness's testimony. (*Id.* at p. 294.)

C. *Contentions*

Comparing this case to *People v. Ayala*, *supra*, 101 Cal.App.5th 62, Rodriguez contends the court's admission of N.R.'s conditional examination violated his confrontation rights because the prosecution did not demonstrate she was unavailable for trial, and did not act with reasonable diligence in attempting to secure her presence. He argues: "As in *Ayala*—and despite the

15

fact that they feared back in December of 2022 that [N.R.] would not be available to testify—the prosecution did not reasonably look for [N.R.] until days prior to the jury trial. During those days, [the investigator] did exactly what the investigator in *Ayala* did—he looked for [N.R.] at places she was previously known to live or hang out, he called her phone numbers, he spoke to her mother, he looked in the jails, and he notified law enforcement agencies . . . . Importantly, the investigator did not check any local hospitals or drug rehabilitation centers or treatment programs even though the prosecution was aware [N.R.] overdosed on drugs nearly two dozen times." According to Rodriguez, N.R.'s testimony was critical to the prosecution because she was the only person who saw him before the shooting and could testify why he would have a motive to shoot S.D. He points out she was the only eyewitness to events directly before and after the shooting. He argues the error was not harmless under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18); that there was a reasonable possibility it might have contributed to the verdict.

D. *The People Exercised Reasonable Diligence in Attempting to Secure N.R.'s Appearance at Trial*

The circumstances here are more akin to those in *People v. Wilson*, *supra*, 11 Cal.5th 259, and unlike *Ayala* and *Cromer*, which involved lengthy and unexplained delays after the prosecution learned about an individual's disappearance before making efforts to locate him or her. (*People v. Ayala*, *supra*, 101 Cal.App.5th at p. 70 [prosecution "did nothing to locate" witness between late 2017 preliminary hearing and April 2020 trial date]; *People v. Cromer*, *supra*, 24 Cal.4th at pp. 903-904 [six-month delay].) Rodriguez suggests an inordinate delay by his argument that the People should have known of N.R.'s unavailability as of December 2022, but the point is both

unsupported by the record and does not establish unreasonable delay in search efforts. The impetus for the prosecutor's December 2022 request for N.R.'s conditional examination was not suspicion that N.R. would disappear or avoid trial, but that she would overdose and that her "life [was] in jeopardy." And only a few months passed from the time of her conditional examination in January 2023 and the April 2023 start of trial. In the meantime, there was no indication that N.R., who had acknowledged receipt of her trial subpoena on March 24, 2023 and confirmed five days before trial that she would appear, was unwilling to do so. This makes the circumstances like *People v. Wilson*, *supra*, 11 Cal.5th 259, where the prosecution "initially had no reason to suspect [the witness] would be . . . reluctant or unavailable . . . ." (*Id*. at p. 291.) The circumstances here did not trigger any obligation on the prosecution to take preventative measures to stop N.R. from disappearing. (Accord, *People v. Friend* (2009) 47 Cal.4th 1, 68 [record did not reflect the prosecutor had any knowledge of or reason to know of a substantial risk that a witness, though transient, would flee or otherwise disappear; it is only "when there is knowledge of 'a "substantial risk" ' that an ' "important witness would flee," ' " is a prosecutor "required to ' "take adequate preventative measures" to stop the witness from disappearing' "].)

It is true that N.R. did not appear for a scheduled meeting with the prosecutor on April 21, 2023, a few days before trial. That day, however, N.R. confirmed with the district attorney investigator that she had a new phone number, which he attempted to call. The investigator also made efforts the day before trial to search for N.R. in a transient camp, then on the day of trial phoned her without success, leading to issuance of a bench warrant.

Once N.R. failed to appear on the day of trial, the investigator over the course of three days on April 28, 29 and 30, 2023, searched no less than 26 locations where she had reportedly been seen. Rodriguez criticizes the search for failing to look for N.R. at hospitals or rehabilitation centers, but, as in *Wilson*, that investigators could have made additional efforts does not mean the effort they did make was insufficient. (*People v. Wilson*, *supra*, 11 Cal.5th at p. 293.) Additionally, there was no indication N.R. was hospitalized during that time, so Rodriguez has not established such a check would have yielded information about her whereabouts. (Accord, *People v. Windfield* (2021) 59 Cal.App.5th 496, 513 [responding to argument that People were not diligent in locating witness who had moved to another state by contacting hospitals and other medical establishments; "defendants have not established that [the witness] was indeed hospitalized, so there is no reason to believe that such a check would have yielded information about her whereabouts. Defendants cite no authority requiring the prosecution to engage in such a search absent a reason [to] believe it would yield useful information . . . ."].) The prosecution's efforts, coupled with the fact that the People possessed security camera audio recordings of the shooting, which N.R. did not directly witness, compel us to hold the People exercised reasonable diligence in attempting to locate her. The trial court thus did not err in admitting her prior recorded testimony at trial.

## II. *Court's Instruction With CALCRIM No. 3475*

At the People's request and over Rodriguez's counsel's objection that it lacked support in the evidence, the court instructed the jury with a modified version of CALCRIM No. 3475: "The lawful occupant of a property may request that a trespasser leave the property. If the trespasser does not leave within a reasonable time, and it would appear to a reasonable person that the

trespasser poses a threat to property or the owner or occupants, the lawful occupant may use reasonable force to make the trespasser leave. [¶] Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave. [¶] If the trespasser resists, the lawful occupant may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property. [¶] When deciding whether the lawful occupant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the lawful occupant's beliefs were reasonable, the danger does not have to actually have existed."

The court also gave instructions on self-defense (CALCRIM No. 505), provocation (CALCRIM No. 522); voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571), the right to self-defense in a mutual combat or initial aggressor situation (CALCRIM No. 3471), and the fact that a claim of self-defense may not be contrived (CALCRIM No. 3472). The court gave a separate instruction explaining that the right to use of force in self-defense continues only as long as the danger exists or reasonably appears to exist (CALCRIM No. 3474).

Rodriguez contends for several reasons the court prejudicially erred by instructing the jury with CALCRIM No. 3475. He first argues the instruction was irrelevant and lacking evidentiary support in that the People did not present evidence that S.D. was a "lawful occupant" of the garage, and thus entitled to eject him. He argues S.D. "did not rent an apartment at the complex and no evidence was presented that residing in the garage area was permitted" and asserts "[t]he garage itself was not an apartment." He

19

further contends that even if S.D. was a lawful occupant of the garage, the record lacks evidence he (Rodriguez) attempted to enter the garage, was inside it, or that S.D. asked him to leave. Finally, Rodriguez contends the instruction violated his federal due process rights by lessening the prosecution's burden of proving beyond a reasonable doubt he did not act in self-defense. He maintains the error was prejudicial under both *People v. Watson* (1956) 46 Cal.2d 818 and *Chapman v. California, supra,* 386 U.S. 18.[6]

Even if Rodriguez could establish there was an insufficient evidentiary basis to give the instruction, he cannot demonstrate it had any effect on the verdict. The fact of the matter is that if CALCRIM No. 3475 was inapplicable to the facts as presented at trial, it would have been ignored by the jury.

Rodriguez focuses on the absence of evidence indicating that he ever entered the garage and what he believes is the absolute lack of any evidence showing that S.D. asked him to leave in the minutes preceding the shooting. But if Rodriguez is correct, the instruction he complains about was irrelevant and superfluous. The prosecutor's rebuttal argument itself made this point

[6]    If a trial court's instructional error violates the United States Constitution, the standard stated in *Chapman v. California, supra,* 386 U.S. 18, requires the People to prove beyond a reasonable doubt that the error did not contribute to the verdict (*People v. Pearson* (2013) 56 Cal.4th 393, 463), and this court to decide " ' "whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error." ' " (*People v. Bryant* (2014) 60 Cal.4th 335, 395.) But if the court's error violates only California law, the standard is that stated in *People v. Watson, supra,* 46 Cal.2d 818 which permits the People to avoid reversal unless " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Mower* (2002) 28 Cal.4th 457, 484.) Rodriguez maintains the error was prejudicial under *Watson* with regard to the absence of supporting substantial evidence and *Chapman* with regard to the due process violation.

when it mentioned CALCRIM No. 3475. It posited that the instruction could offer guidance, but only *if* the jury found a specific set of three circumstances: "[1] someone shows up unannounced at your house, and [2] *you ask them to leave*, and [3] you ask them, " 'Are we done? Are we good?' " (Italics added.) Even if there was testimony that could support the occurrence of the first and third circumstances, the premise for Rodriguez's contention is that there was absolutely no evidence the second circumstance ever occurred. As framed, the prosecutor's argument conceded that in that case, the instruction was inapplicable.

Indeed, the court specifically told the jurors that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed this instruction. (*People v. Winbush* (2017) 2 Cal.5th 402, 457.) And it is well settled that "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335.) Nor can Rodriguez successfully argue that such an allegedly inapplicable instruction reduced the prosecution's burden of proof. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.)

III. *Section 12022.53, Subdivision (d) Enhancement*

A. *Background*

On the murder charge, the jury found true an allegation that Rodriguez personally and intentionally discharged a firearm and proximately caused death to a person other than an accomplice under section 12022.53, subdivision (d). It also found true the section 12022.5, subdivision (a)

21

allegation that Rodriguez personally used a firearm in the commission of the offense. The People in their sentencing statement asked the court to impose the section 12022.53, subdivision (d) enhancement consecutively to the murder sentence, arguing that striking or staying that punishment would not be in the interest of justice.

In his sentencing memorandum, Rodriguez urged the court to exercise its discretion to strike the section 12022.53, subdivision (d) enhancement. He asserted that section 12022.53, subdivision (h) gave the court discretion to do so, and listed factors the court was required to consider in making its decision, including mitigating factors that the victim "was a provoker of, and willing participant in, the incident"; the crime stemmed from "an unusual circumstance that is unlikely to recur"; and he had no prior record, or an insignificant record of criminal conduct. Citing *People v. Tirado* (2022) 12 Cal.5th 688, he asked the court to impose a lesser enhancement in furtherance of the interests of justice if it were to decline to strike the section 12022.53, subdivision (d) allegation.

Rodriguez's sentencing hearing took place in June 2023. At the hearing, the court initially acknowledged that "defense is moving that I exercise discretion that is newly found discretion, legally to strike the gun allegation. My strong tentative, given the nature of that offense, is to not strike it. It's a murder involving a firearm. That's the only discretion I have."

Rodriguez's counsel argued the additional 25-year-to-life enhancement was "disproportionate to what took place in this case." He mentioned Rodriguez's lack of any criminal history and minimal record and argued: "In this particular case, because the law on its face, that the court has a discretion because the supreme court has ruled that the court has discretion,

22

based upon the totality of circumstances, to determine whether the additional 25 to life is appropriate or not. [¶] And I would ask the court to take into consideration the totality of factors in this case, take into consideration the underlying current in this case, take into consideration the background and upbringing of the various participants in this particular case. And I'd ask the court to consider quite seriously to strike the gun allegation in this matter."

The prosecutor pointed out the murder was "senseless and unprovoked"; that Rodriguez "could have walked away and could have ended this" but instead came back to pick a fight and murder S.D. He pointed out the case was "unique" for the presence of audio evidence of the events leading up to the murder, which showed S.D. asking, "Are we done?" indicating the conflict was over, and Rodriguez escalating matters. Counsel pointed out that Rodriguez kept firing the gun even after it had malfunctioned, and that he "had no remorse [and was] completely devoid of emotion. And through his own will and volition murdered [S.D.]. [¶] So for all of those reasons, the court should absolutely impose the 12022.53[, subdivision] (d) allegation."

The court denied Rodriguez's request to strike the enhancement and imposed it: "Initially, there's a motion before the court to strike the 12022.53[, subdivision] (d) allegation. I've considered that motion. I'm going to deny that motion. The very nature of this offense involves the use of a firearm to effectuate the murder and as such I think it's an appropriate part of this sentence. [¶] . . . [¶] As to the special allegation, pursuant to . . . section 12022.5[, subdivision] (a), four years will be ordered but the punishment will be struck, pursuant to [section] 654, as it's duplicative of the next allegation, which is [section] 12022.53[, subdivision] (d) where I'll order another 25 years to life to be served consecutive for the maximum punishment available by law of 50 years to life."

23

B. *Legal Principles*

A sentencing court, "in the interest of justice pursuant to [s]ection 1385" may "strike or dismiss an enhancement otherwise required to be imposed" under section 12022.53. (§ 12022.53, subd. (h); *People v. McDavid* (2024) 15 Cal.5th 1015, 1020-1021; *People v. Tirado, supra,* 12 Cal.5th at p. 692 ["[T]he statutory framework [of section 12022.53] permits a court to strike the section 12022.53[, subdivision] (d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead"].)

*People v. Tirado* held that the court's discretion under this sentencing scheme included striking a section 12022.53 enhancement and then imposing a lesser included, uncharged section 12022.53 enhancement when the facts supporting the lesser enhancement were alleged and found true by the jury. (*People v. Tirado, supra,* 12 Cal.5th at pp. 692, 700.) "[T]he main issue in *Tirado* was whether a court after striking a section 12022.53, subdivision (d) enhancement may impose a lesser included subdivision (b) or (c) enhancement . . . ." (*People v. McDavid, supra,* 15 Cal.5th at p. 1030.) *Tirado* did not decide whether the court could also impose a lesser included, uncharged enhancement under statutes other than section 12022.53, such as section 12022.5, subdivision (a). (*McDavid,* at p. 1030.)

After Rodriguez's sentencing hearing, the California Supreme Court decided in *People v. McDavid, supra,* 15 Cal.5th 1015 that trial courts had such discretion. (*Id.* at p. 1030.) The court in *McDavid* resolved a split among appellate courts as to whether trial courts had the discretion to impose an uncharged lesser included firearm offense outside of section 12022.53 after striking under section 12022.53, subdivision (h) a charged and proven section 12022.53 firearm enhancement. (*McDavid,* at pp. 1022-1023.) *McDavid* held: "[W]hen a court has exercised its discretion under [section

24

12022.53,] subdivision (h), to strike a section 12022.53 enhancement and finds that no other section 12022.53 enhancement is appropriate, the second sentence of subdivision (j) is inapplicable and does not bar the court from imposing a lesser included, uncharged enhancement under a law other than section 12022.53." (*McDavid, supra*, 15 Cal.5th at p. 1030.)

We review a trial court's determination concerning dismissal of a firearm enhancement for abuse of discretion. (See *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.) If the party attacking the sentence does not clearly show that the sentencing decision was irrational or arbitrary, " ' "the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.) Where a court fails to recognize the full scope of its sentencing discretion, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424.)

C. *Contentions*

Rodriguez contends the record does not reflect the trial court was aware of its authority to strike the section 12022.53, subdivision (d) firearm enhancement and instead impose the enhancement under section 12022.5. He points out the court in *People v. Tirado, supra*, 12 Cal.5th 688 did not address whether a court could substitute an enhancement under a different law, such as section 12022.5, subdivision (a). Though he acknowledges his sentencing memorandum asked the court to impose a lesser enhancement if it did not strike the section 12022.53, subdivision (d) enhancement, he argues the court did not acknowledge it had such discretion. Rodriguez further

25

argues the court abused its discretion when it considered inappropriate factors and disregarded appropriate factors in refusing to strike the enhancement. He maintains the court's refusal to dismiss the enhancement violated his Fourteenth Amendment due process rights.

D. *Analysis*

We need not decide whether the trial court at sentencing was aware of its discretion under *People v. McDavid*, *supra*, 15 Cal.5th 1015. We hold another resentencing hearing is not necessary because whether or not the court was aware of this discretion, it undoubtedly would not have exercised it. That is, this record " ' "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar*, *supra*, 15 Cal.5th at p. 425.)

Here, Rodriguez alerted the court to its "newly found discretion" under *People v. Tirado*, *supra*, 12 Cal.5th 688, and the court acknowledged his request that it exercise that discretion but declined to impose any lesser firearm enhancements. The court's implied finding was that the interests of justice did not support striking the section 12022.53, subdivision (d) enhancement. If the trial court declined to impose a 10- or 20-year firearm enhancement under section 12022.53, subdivision (b) or (c) under *Tirado*, it would not have exercised its discretion to impose a three-, four-, or 10-year enhancement under section 12022.5, subdivision (a). The record in our view clearly indicates that the court would not have chosen to substitute a lesser firearm enhancement even had *People v. McDavid*, *supra*, 15 Cal.5th 1015 been decided prior to Rodriguez's sentencing.

We recognize that "[w]hen the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have

26

done if it had known the scope of its discretionary powers at the time of sentencing." (*People v. Salazar*, *supra,* 15 Cal.5th at p. 431.)  This record presents no such speculation, however, and falls within the exception to that rule.

Having reviewed all the circumstances of Rodriguez's sentencing in this record, we conclude remand for resentencing is unwarranted.

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


CASTILLO, J.